*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| JUNIOR ANTENOR, KEILAN C. EBLI, and LOREN J. LARSON JR., | ) ) ) | Supreme Court No. S-17005 |
| Appellants, | ) ) | Superior Court No. 3AN-81-05274 CI |
| v. | ) ) | O P I N I O N |
| STATE OF ALASKA, DEPARTMENT OF CORRECTIONS, | ) ) ) | No. 7442 – April 17, 2020 |
| Appellee. | ) ) ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Pamela Scott Washington, Judge pro tem.

Appearances: Junior Antenor, pro se, Keilan C. Ebli, pro se, and Loren J. Larson, Jr., pro se, Wasilla, Appellants. Matthias Cicotte, Assistant Attorney General, Anchorage, and Kevin Clarkson, Attorney General, Juneau, for Appellee.

Before: Bolger, Chief Justice, Stowers, Maassen, and Carney, Justices. [Winfree, Justice, not participating.]

CARNEY, Justice.

## I. INTRODUCTION

In this appeal we address two separate challenges presented by inmates at an Alaska correctional facility to Department of Corrections (DOC) policies. First, the inmates challenge telephone charges for local calls by inmates, arguing that the rates they

and call recipients must pay for calls violate their constitutional right to rehabilitation, their statutory right to reasonable telephone access, and DOC's contractual obligations under a prior settlement and consent decree. Second, one of the prisoners challenges DOC officers' decision to deny him access to a computer programming book he ordered from outside the prison. He contends that DOC placed a content-specific restriction on the educational materials and publications prisoners are allowed, violating the Alaska Constitution's free speech provisions as well as prisoners' right to reformation. Each of these challenges reach this court after inmates exhausted the administrative process from prison as set forth in *Cleary v. Smith*.[1] Inmates then appealed to the Superior Court where their prayers for relief were denied. The present appeal follows.

## II. FACTS AND PROCEEDINGS

### A. Background

Appellants Loren J. Larson, Jr., Keilan C. Ebli, and Junior Antenor are inmates in DOC custody at Goose Creek Correctional Center. They have raised two challenges to DOC policies. First, Larson and Ebli assert that increased charges for local telephone calls violate inmates' state rights to rehabilitation and telephone access. Second, Antenor argues that Goose Creek officers' decision not to permit him to have a certain computer programming book reflects an "unwritten" blanket ban on all computer-related books, and thus violates his rights to free speech and reformation. Because the inmates brought their claims as motions to enforce a final settlement in *Cleary*,[2] a previous class action lawsuit by inmates against DOC, and because their

---

[1]    Final Settlement Agreement and Order, *Cleary v. Smith*, No. 3AN-81-05274 CI (Alaska Super., Sept. 21, 1990).

[2]    *Id.*

claims are governed by the Alaska Prison Litigation Reform Act[3] (APLRA), we review the relevant portions of the *Cleary* case and the APLRA.

### 1. The *Cleary* case and settlement

We summarized the relevant proceedings of the *Cleary* case in *Smith v. Cleary*:

> This case began in 1981 as a class action brought against the state by Alaska prisoners challenging prison conditions. The plaintiffs formed three subclasses: pretrial detainees (subclass A), sentenced prisoners in state owned or operated correctional centers (subclass B), and prisoners held by the state in federal facilities (subclass C). Although the state and subclass C settled in 1983, litigation continued with the remaining subclasses until the parties entered a comprehensive settlement, which the superior court incorporated in a consent decree in 1990.
>
> The settlement agreement applied to "all inmates, with some exceptions, who are or will in the future be incarcerated in correctional facilities owned or operated by the state" and bound the Department of Corrections and "any successor department, division, or agency of the state of Alaska which is statutorily responsible for the administration of the state's adult correctional facilities." It included elaborate provisions for future operation of Alaska prisons, enumerated rights of inmates, guaranteed the availability of specific rehabilitative programs and services, required the state to implement an inmate classification system, created population guidelines, and established caps to eliminate overcrowding. The agreement also established mechanisms to monitor ongoing compliance, including a provision calling for a designated

---

[3] AS 09.19.200.

superior court judge to have continuing jurisdiction over alleged violations.[4]

The Final Settlement Agreement and Order[5] provided that individual inmates could raise compliance challenges as long as they first exhausted all administrative remedies.[6]

### 2. Alaska Prison Litigation Reform Act

In 1999 the Alaska legislature passed the APLRA.[7] The APLRA imposed strict limitations on prisoner lawsuits, limited the remedies courts could order for violations of inmates' rights, and established standards for terminating prospective relief under a consent decree such as the *Cleary* Final Settlement Agreement.[8] Specifically, subsection (a) of the APLRA provides:

> Except as provided in (b) and (e) of this section, a court may not order prospective relief in a civil action with respect to correctional facility conditions unless the court finds that (1) the plaintiff has proven a violation of a state or federal right, (2) the prospective relief is narrowly drawn and extends no further than is necessary to correct the violation of the right, (3) the prospective relief is the least intrusive means necessary to correct the violation of the right, and (4) the

---

[4]     *Smith v. Cleary*, 24 P.3d 1245, 1246-47 (Alaska 2001); *see also Barber v. State, Dep't of Corr.*, 393 P.3d 412, 414 (Alaska 2017).

[5]     Also referred to as the consent decree.  *See Barber*, 393 P.3d at 414 n.2.

[6]     *Id.* at 415 (quoting *Smith v. Cleary*, 24 P.3d at 1251).  The Alaska Administrative Code (AAC) and DOC's Polices and Procedures establish the relevant administrative remedies prisoners must exhaust.  22 AAC 05.185 (2017); STATE OF ALASKA, DEP'T OF CORR., POLICIES & PROCEDURES 808.03 (2006), http:// www.correct.state.ak.us/corrections/pnp/pdf/808.03.pdf (detailing specific procedures for prisoners to pursue grievances against DOC).

[7]     Ch. 42, § 2, SLA 1999; *see* AS 09.19.200.

[8]     AS 09.19.200(a)-(c).

prisoner has exhausted all administrative remedies available . . . before filing the civil action.[9]

The APLRA defines a "state or federal right" as "a right arising from the United States Constitution, the Constitution of the State of Alaska, or a federal or state statute."[10]

In 2000 DOC moved to terminate the Final Settlement Agreement pursuant to the APLRA.[11] At the time, inmate plaintiffs immediately opposed, raising several challenges to the APLRA under the Alaska and United States Constitutions.[12] Superior Court Judge Elaine M. Andrews issued a ruling in 2001, interpreting the APLRA to terminate only the prospective effect of the Final Settlement Agreement, not the Agreement itself, and concluding that, under this narrow reading, the statute was constitutional.[13] Judge Andrews concluded that the APLRA thus limited the court's ability to order continuing prospective relief under the Final Settlement Agreement.[14] We later determined that because no party had appealed the 2001 superior court decision,

---

[9] AS 09.19.200(a).

[10] AS 09.19.200(g)(7).

[11] Decision and Order, *Cleary v. Smith*, No. 3AN-81-05274 CI, at *2 (Alaska Super., July 3, 2001); *see also Barber v. State, Dep't of Corr.*, 393 P.3d 412, 415 (Alaska 2017); AS 09.19.200(c).

[12] Decision and Order, *Cleary v. Smith*, No. 3AN-81-05274 CI, at *2-*3 (Alaska Super., July 3, 2001).

[13] *Id.* at *1, *4-*8.

[14] *Id.* at *7 (*See also Gilmore v. California*, 220 F.3d 987, 999 (9th Cir. 2000) (holding that under federal Prison Litigation Reform Act, courts cannot order prison administrators "to do more than the constitutional minimum")).

"that decision became [the] law of the case."[15] Thus under Judge Andrews's reading of the APLRA, inmates may seek to enforce the Final Settlement Agreement via a motion in superior court so long as: they allege a violation of a state or federal right that affects the entire class of *Cleary* plaintiffs; they exhaust their administrative remedies prior to filing a motion; the requested relief uses the least intrusive means to correct the rights violation; and the court takes into account potential adverse effects on public safety.[16]

## B. Challenge To Local Telephone Call Rates

### 1. Facts

Alaska Statute 33.30.231 requires DOC to provide prisoners with reasonable access to a telephone and permits DOC to contract with private companies to provide this service;[17] DOC therefore contracted with Securus Technologies for phone services.[18] Inmates generally are not permitted to receive calls from outside the correctional facility where they are housed.[19] All inmate calls, whether local or long distance, must be placed collect at the expense of the recipient, if the recipient accepts

---

**15** *Barber*, 393 P.3d at 416. The law of the case doctrine generally "prohibits the reconsideration of issues which have been adjudicated in a previous appeal in the same case." *Id.* at 419 (quoting *Beal v. Beal*, 209 P.3d 1012, 1016 (Alaska 2009)). We have further held that "in the context of the *Cleary* Final Settlement Agreement, the law of the case doctrine is applicable to issues that were fully litigated resulting in a final order which was not timely appealed." *Id.*

**16** *Id.* at 421; *see* AS 09.19.200(a).

**17** AS 33.30.231(a), (d); *see* AS 36.30.005-.086 (governing procurement contracts by government agencies).

**18** *See Inmate Phone System*, STATE OF ALASKA, DEP'T OF CORR., http://www.correct.state.ak.us/inmate-phone-system (last visited July 30, 2019).

**19** *Id.* ("Inmates may only place outgoing calls and cannot receive incoming calls to their facility.").

the call.[20] If the recipient agrees to pay the cost of the call, he or she may do so either through an account that has been previously established with Securus or by direct billing from Securus.[21] In November 2014 Securus applied to the Regulatory Commission of Alaska (RCA) to raise its rate;[22] after issuing public notice of the application, RCA approved Securus's request in June 2015.[23] On October 1, 2015, Securus began charging $1 per local call.[24]

---

[20] *Id.*

[21] *Id.*

[22] Application, *In re Application of Securus Technologies, Inc. for a Certificate of Public Convenience and Necessity to Provide Private Pay Telephone Service to Inmates in Alaska Department of Corrections Facilities*, RCA Docket No. U-14-113, (Nov. 13, 2014), http://rca.alaska.gov/RCAWeb/ViewFile.aspx?id=B11994 FE-4563-460B-A347-99674E22F514.

[23] Order Approving Application, Granting Motion for Waiver of Certain Service Requirements, Approving Tariff Sheets, and Requiring Compliance Filings, *In re Application of Securus Technologies, Inc. for a Certificate of Public Convenience and Necessity to Provide Private Pay Telephone Service to Inmates in Alaska Department of Corrections Facilities,* RCA Docket No. U-14-113, (June 12, 2015), http://rca.alaska.gov/RCAWeb/ViewFile.aspx?id=e28889c7-f0b3-4c2d-9343-c7ce31ed96a0.

[24] DOC asserts that local call rates are $0.07 per minute "with a cap of $1.00," but nothing in the record confirms this; Securus's petition sought a "$1.00 flat rate charge for a local call of whatever duration is permitted by the DOC facility," and this was the rate approved by the Regulatory Commission. Application, *In re Application of Securus Technologies, Inc. for a Certificate of Public Convenience and Necessity to Provide Private Pay Telephone Service to Inmates in Alaska Department of Corrections Facilities*, RCA Docket No. U-14-113, at *5 (Nov. 13, 2014), http://rca.alaska.gov/RCAWeb/ViewFile.aspx?id=B11994FE-4563-460B-A347-99674E22F514; Order Approving Application, Granting Motion for Waiver of Certain Service Requirements, Approving Tariff Sheets, and Requiring Compliance Filings, *In re Application of Securus Technologies, Inc. for a Certificate of Public*

(continued...)

In late March 2017 Larson submitted a request for interview (RFI) — a written form used by inmates to raise concerns or complaints with prison staff — in which he asserted that DOC had violated Section V(C)(2) of the Final Settlement Agreement by allowing Securus to charge $1 for local telephone calls.[25] He sought restitution for the money paid by recipients of local collect calls from inmates since the price increase had gone into effect. DOC denied his RFI, claiming it lacked authority to grant his requests to reduce local call charges and pay restitution because it did not directly set rates or collect money for the calls. Larson filed a prisoner grievance in early April, which was denied on the ground that the issue of local calls had already been "grieved by the prisoner or by another prisoner and resolved."

---

[24]    (...continued)
*Convenience and Necessity to Provide Private Pay Telephone Service to Inmates in Alaska Department of Corrections Facilities,* RCA Docket No. U-14-113 (June 12, 2015), http://rca.alaska.gov/RCAWeb/ViewFile.aspx?id=e28889c7-f0b3-4c2d-9343-c7ce31ed96a0.

[25]    Section V(C)(2) of the *Cleary* Final Settlement Agreement provides:

> (a) The Department may install coinless pay phones in each facility for local and long distance calls which provide caller identification for each call. No charge shall be assessed to the caller or recipient for local calls. . . .

> (b) If, after one year of operation on a statewide basis, revenues from toll calls are insufficient to pay for the cost of local calls in the coinless pay phone system, the Department reserves the right to assess a charge of not more than [$0.50] per call for local calls. If the Department exercises this right, the plaintiffs have the corresponding right to challenge any charge as to its amount and necessity, and to propose less costly or restrictive alternatives.

Final Settlement Agreement and Order, *Cleary v. Smith*, No. 3AN-81-05274 CI, at *28 (Alaska Super., Sept. 21, 1990).

Shortly after Larson submitted his RFI, another inmate, Billy Jack Wiglesworth, filed a similar RFI challenging local call rates. In addition to the arguments Larson had made, Wiglesworth contended that the increased rate violated prisoners' state right to telephone access under AS 33.30.231.[26] He argued that although DOC had discretion to contract for telephone services, its delegation of those services to Securus did not relieve it of its duty to ensure that telephone charges complied with the Final Settlement Agreement.[27] When his RFI was denied Wiglesworth filed a prisoner grievance, which DOC denied on the same grounds as Larson's, as well as because DOC lacked the ability to change call rates that had been "approved by the Regulatory Commission of Alaska."

### 2. Proceedings

In late May 2017 Larson and Wiglesworth jointly filed a motion to enforce the *Cleary* Final Settlement Agreement and for restitution. They argued that under the Final Settlement Agreement DOC had to petition the court and show that revenue from long-distance calls did not cover the cost of local calls before it could raise local call rates. DOC had never filed such a petition; even if it had, the inmates argued, the Final Settlement Agreement established a maximum call charge of $0.50. They contended that DOC's decision to contract with Securus for telephone services did not relieve it of its

---

[26] AS 33.30.231(a) provides: "A prisoner shall have reasonable access to a telephone except when access is suspended as punishment for conviction of a rule infraction or pending a hearing for a rule infraction involving telephone abuse."

[27] Wiglesworth asserted that the Final Settlement Agreement was in effect a contract and cited this court's observation that "[u]nless the obligee agrees otherwise, neither delegation of performance nor a contract to assume the duty made with the obligor by the person delegated discharges any duty or liability of the delegating obligor." *Seville v. Holland Am. Line Westours, Inc.*, 977 P.2d 103, 111 n.49 (Alaska 1999) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 318(3) (AM. LAW INST. 1981)).

duties under the Agreement or of liability if it breached those duties. They further argued that the increased charges for local calls infringed on both their right to reasonable telephone access under AS 33.30.231(a) and their rights to free speech and reformation under the Alaska Constitution.[28] They attached affidavits from Larson's mother and Wiglesworth's parents, who asserted that they had paid $480, $1440, and $2,300 for local calls from their sons between October 2015 and March or April 2017.

In mid-June DOC opposed Larson and Wiglesworth's motion to enforce. DOC argued the inmates had not alleged violation of a state or federal right as required by the ALPRA, because AS 33.30.231 required only "access to the telephone" and said nothing about cost.[29] DOC argued that "since prisoners are almost universally charged for telephone calls, . . . no [free speech] right to free calls exists." Finally, DOC argued that restitution was not an appropriate remedy because the individuals paying for the calls were not parties to the *Cleary* Final Settlement Agreement.

Shortly afterward Ebli moved to join Larson and Wiglesworth's motion, asserting that he had attempted to pursue essentially the same grievance as they had. DOC did not oppose Ebli's motion to join, though at one point it attempted to argue that he was not a proper party and that Larson was engaging in the unauthorized practice of law by jointly filing a motion with Ebli. The court allowed the joint pleadings and

---

[28]     *See* AS 33.30.231(a); Alaska Const. art. I, §§ 5 ("Every person may freely speak, write, and publish on all subjects, being responsible for the abuse of that right."), 12 ("Criminal administration shall be based upon the following:  the need for protecting the public, community condemnation of the offender, the rights of victims of crimes, restitution from the offender, and the principle of reformation."). We have held that the reference in article I, section 12 of the Alaska Constitution to "the principle of reformation" is "not a meaningless guarantee," but creates "a right to rehabilitation." *Ferguson v. State, Dep't of Corr.*, 816 P.2d 134, 139 (Alaska 1991).

[29]     *See* AS 09.19.200(a); AS 33.30.231(a).

eventually issued a written order granting Ebli's motion to join.

In late June 2017 Larson and Wiglesworth replied to DOC's opposition. They argued that the Final Settlement Agreement provision addressing local call costs was "directed at" the right to reasonable telephone access established by AS 33.30.213(a) and that by breaching the Agreement, DOC had infringed on that right. They further argued that the persons paying for local calls — generally family members of prisoners — were intended beneficiaries of the Final Settlement Agreement and thus entitled to restitution because the Agreement specifically stated that DOC would not charge either "the caller or the recipient."[30] A few days later Larson and Ebli filed a "Supplemental Argument." They argued that DOC was evading its settlement obligations by allowing Securus to raise the rates for local calls, and that the only permissible ways for DOC to change those obligations was to seek a modification through the procedure provided in the settlement or to challenge Judge Andrews's 2001 order upholding the consent decree. They contended that allowing DOC to breach the

---

[30] We have adopted the test of the Restatement (Second) of Contracts to determine whether a third party is an intended beneficiary of a contract:

> Unless otherwise agreed between the promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either
>
> (a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or
>
> (b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.

*Rathke v. Corr. Corp. of Amer., Inc.*, 153 P.3d 303, 310 (Alaska 2007) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 302 (AM. LAW INST. 1979)).

Final Settlement Agreement would signal to inmates that "laws, rules, and procedures are merely a suggestion . . . and . . . don't have to be followed," would discourage inmates from becoming law-abiding citizens, and would deprive them of a meaningful right to rehabilitation.[31]

In December 2017 the superior court denied the motion to enforce, finding "There is nothing in AS 33.30.231(a) that guarantees prisoners [a] right to make free phone calls." The court also found that the Alaska Constitution's free speech provision only required DOC to refrain from restricting inmates' ability to "freely speak, write or publish on all subjects";[32] it did not require DOC to provide inmates with "*free* tools with which to cast [their] speech out into the world." (Emphasis in original.) Larson and Ebli appeal; Wiglesworth does not join the appeal.

## C. Challenge To Prohibition On Computer Programming Book

### 1. Facts

Around April 2017 appellant Junior Antenor attempted to order a computer programming book called *Programming Arduino Next Steps*.[33] He asserts that he

---

[31] *See* Alaska Const. art. I, § 12; *see also Abraham v. State*, 585 P.2d 526, 530-31 (Alaska 1978) ("[O]ne of the objectives of [article I, section 12 of the Alaska Constitution] . . . was the 'rehabilitation of the offender into a noncriminal member of society.' " (quoting *State v. Chaney*, 477 P.2d 441, 444 (Alaska 1970))).

[32] *See* Alaska Const. art. I, § 5.

[33] *See* SIMON MONK, PROGRAMMING ARDUINO NEXT STEPS: GOING FURTHER WITH SKETCHES (2014). Arduino is an electronics platform that uses the Arduino programming language and a corresponding set of software development tools (called an integrated development environment or IDE) to program microcontrollers known as Arduino boards. *See* Introduction, ARDUINO, https://www.arduino.cc/en/Guide/ Introduction (last visited July 24, 2019). The Arduino language is based on the programming languages C and C++, and it can be used to operate an Arduino board

(continued...)

ordered the book to engage in further self-study after taking an electronics class at Goose Creek. However, DOC officials at Goose Creek refused to accept delivery of the book, stating that "program[m]ing books [were] not allow[ed] for security reasons."[34]

DOC policy provides that incoming publications must be individually reviewed and that if they include "material that could reasonably be expected to aid in escape [or] incite violence, theft, or destruction of property in the facility," they must be rejected.[35] However, the policy prohibits DOC officials from "establish[ing] an excluded list of publications" and rejecting a multiple-issue publication "in its entirety" even if several individual issues of the publication are found to contain prohibited material.[36] Additionally the policy requires all publications sent to inmates to be "ordered and received directly from an approved vendor or publisher"; Antenor has asserted and DOC

---

[33] (...continued)
through a computer if first translated by another software program known as a compiler. *Id.* Antenor points out that he ordered only the book, not any of the related hardware or software, implying that without these he would have been unable to use any Arduino code he wrote to threaten the security of the facility. DOC does not respond to this suggestion; the record contains no evidence of whether Antenor would have been able to run Arduino-based code on any of Goose Creek's existing computers.

[34] Antenor had attempted to order computer-related books on at least one prior occasion in 2014; those books were similarly rejected on the basis that "[c]omputer programming [b]ooks constitute a threat to safe and secure operation of the [f]acility." The superintendent's determination stated that the books had been screened and determined to contain "some content [that] would be a detriment" to security at Goose Creek and that Antenor could "participate in computer education classes" at the prison.

[35] STATE OF ALASKA, DEP'T OF CORR., POLICIES & PROCEDURES 810.03 § VIII(B)-(C)(1) (2018), www.correct.state.ak.us/pnp/pdf/810.03.pdf.

[36] *Id.* § VIII(B).

does not dispute that he ordered the book from an approved vendor.[37]

In mid-April 2017 Antenor submitted an RFI challenging Goose Creek's rejection of the book and stating that a "blanket ban on [e]ducation [b]ooks like the one at issue here . . . violates the *Cleary* [consent decree]."  When his RFI was denied, he filed a grievance stating that neither DOC's governing regulations nor the Final Settlement Agreement "prohibit[ed] educational books regarding programming languages."  His grievance was denied on the ground that the "[i]ssue of computer educational books [had been] previously grieved and denied" when he had attempted to order programming books in 2014.

### 2. Proceedings

In June 2017 Antenor and Wiglesworth jointly filed a motion to enforce the *Cleary* Final Settlement Agreement.[38]  Antenor alleged that Goose Creek had implemented an "unwritten" standard operating procedure banning "any computer based educational literature"; he argued that this amounted to "a content-based restriction on speech which also burdens a prisoner's right to rehabilitation."[39]  Antenor pointed to AS 33.30.011(a)(3), which requires the DOC commissioner to establish programs to develop inmates' education and occupational skills and "otherwise provide for [their]

---

[37] Former STATE OF ALASKA, DEP'T OF CORR., POLICIES & PROCEDURES 810.03 § (VII)(H) (2013), https://www.law.umich.edu/special/policyclearinghouse/Documents/Alaska%20-%20810.03.pdf.

[38] In the motion Wiglesworth raised a challenge to DOC's "approved vendor" policy, which prohibits inmates from receiving publications except directly from approved vendors. *See id.*  Because this issue was not raised on appeal, as Wiglesworth does not participate in the appeal, we do not address it.

[39] *See* Alaska Const. art. I, §§ 5, 12.

rehabilitation and reformation,"[40] and AS 33.30.191, which provides for prisoners to "be productively employed for as many hours each day as feasible."[41] He argued that these statutes, plus DOC's regulations on educational programs and reading material for prisoners,[42] required that he be allowed to have access to the Arduino book. He argued that under 22 AAC 05.510(b) DOC could only ban publications "reasonably . . . expected to (1) aid an escape; (2) incite or encourage any form of violence or other criminal activity; or (3) have an adverse impact on the rehabilitation of the prisoner possessing [it] or other prisoners."[43] Antenor pointed out that the *Cleary* Final Settlement Agreement imposes similar limits.[44] He argued that none of the listed

---

[40] AS 33.30.011(a)(3)(C), (D), (F).

[41] AS 33.30.191(a).

[42] 22 AAC 05.340 ("[DOC] will provide an educational program to the extent permitted by available resources. . . . Post-secondary education opportunities consisting of courses or correspondence study will also be made available to prisoners."); 22 AAC 05.510(a) (providing that prisoners "may request any reading material" available "through the state library system" and are "not limited to the facility's collection").

[43] 22 AAC 05.510(b).

[44] Section V(D)(4) of the Final Settlement provides:

Except for the categories set out below, the Department may not limit or restrict the receipt by inmates through the mail of paperback books and magazines from family and friends, but may limit the number of books kept by an inmate in his or her living area . . . . However, the Department may inspect reading or pictorial materials to determine if they contain contraband; material which could reasonably be expected to aid in escape, incite violence, theft or destruction of property in the facility; material which is obscene . . . ; or which depicts or describes procedures for the brewing of alcoholic

(continued...)

grounds for prohibiting books were "applicable to computer programming books."

In July 2017 DOC moved to strike Antenor and Wiglesworth's motion to enforce, arguing that Wiglesworth was not a proper party to the motion and appeared to be engaging in the unauthorized practice of law. Antenor and Wiglesworth opposed the motion to strike, arguing that as members of the class of *Cleary* plaintiffs they were both proper parties, that their claims could properly be joined, and that DOC had provided no evidence or factual basis for the claim that Wiglesworth was engaging in the unauthorized practice of law. The superior court eventually denied DOC's motion to strike.

In the same order in which it denied Larson, Wiglesworth, and Ebli's motion on the local telephone call rates, the superior court denied Wiglesworth and Antenor's motion to enforce. The court concluded that Antenor had "no inherent right to receive books on a particular subject matter" and that the "wide-ranging deference" to which prison administrators are entitled applied to Goose Creek's discretionary decision to limit the content of reading material available to inmates.[45] The court later issued an amended order that left unchanged its decisions on both motions to enforce.

Larson, Ebli, and Antenor appeal.

## III.   STANDARDS OF REVIEW

"Principles of contract interpretation govern the construction and

---

[44]   (...continued)
beverages or manufacture of drugs, weapons or explosives.

Final Settlement Agreement and Order, *Cleary v. Smith*, No. 3AN-81-05274 CI, at *31 (Alaska Super., Sept. 21, 1990).

[45]   *Bell v. Wolfish*, 441 U.S. 520, 547 (1979) ("Prison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.").

enforcement of the *Cleary* Final Settlement Agreement."[46] We review de novo questions of contract law dealing with "[t]he settlement agreement's scope and effect."[47] "We review issues concerning constitutional rights of inmates de novo."[48]

"The interpretation of a statute is a question of law to which we apply our independent judgment, interpreting the statute according to reason, practicality, and common sense, considering the meaning of the statute's language, its legislative history, and its purpose."[49] Where "the superior court 'act[ed] as an intermediate appellate court in an administrative matter,' we 'independently review the merits of the administrative decision.' "[50]

## IV. DISCUSSION

### A. The Record Lacks Sufficient Evidence To Determine Whether Current Local Telephone Call Rates Are Reasonable Or Constitutional.

Larson and Ebli first argue that DOC breached the *Cleary* Final Settlement Agreement by allowing Securus to raise local call rates by filing a petition with the Regulatory Commission of Alaska rather than by moving to modify the Final Settlement Agreement in superior court. They contend that DOC's delegation of the duty to provide telephone services to Securus does not absolve it of its contractual obligation to adhere to the price limits and modification procedures in the Agreement. They further argue

---

[46] *Barber v. State, Dep't of Corr.*, 393 P.3d 412, 418 (Alaska 2017).

[47] *Id.* (quoting *Smith v. Cleary*, 24 P.3d 1245, 1247 (Alaska 2001)).

[48] *Simmons v. State, Dep't of Corr.*, 426 P.3d 1011, 1015 (Alaska 2018).

[49] *Johnson v. State, Dep't of Corr.*, 380 P.3d 653, 655 (Alaska 2016) (quoting *Barber*, 314 P.3d at 62).

[50] *Simmons*, 426 P.3d at 1015 (alteration in original) (quoting *James v. State, Dep't of Corr.*, 260 P.3d 1046, 1050 (Alaska 2011)).

-17- 7442

that this breach violates their right to reasonable access to telephone services under AS 33.31.231(a); their and their friends' and families' rights to free speech and association under article I, section 5 of the Alaska Constitution; and their right to rehabilitation under article I, section 12 of the Alaska Constitution. They assert that recipients of inmate calls, who paid for the calls, are entitled to restitution for payments made after the rate increase, presumably as intended third-party beneficiaries of the Final Settlement Agreement.

In response DOC argues that neither AS 33.30.231(a)'s guarantee of "reasonable access" to telephones nor the Alaska Constitution's free speech provision confers a "right to free telephone calls." The *Cleary* Final Settlement Agreement, DOC notes, expressly provides for the possibility that local call rates might be raised to $0.50 per call. DOC argues that, given the rate of inflation since the Agreement took effect in 1990, charging up to $1 per call "does not establish the violation of a constitutional right" or unreasonably burden telephone access.

We note first that the plain terms of the *Cleary* Final Settlement Agreement establish a maximum charge for local call rates at $0.50. The Agreement does not mention adjustment for inflation, and it provides inmates an opportunity to challenge the amount and necessity of any rate increase and propose alternatives. But the prisoners' claim that DOC failed to follow the Final Settlement Agreement's call rate limits and modification procedures is essentially a common-law breach of contract claim.[51] Under Judge Andrews's reading, the APLRA requires termination of prospective relief under a consent decree upon DOC's motion, unless the court finds that DOC's current practices

---

[51]     *See Barber*, 393 P.3d at 418 (applying principles of contract interpretation to enforcement of *Cleary* Final Settlement Agreement).

violate a state or federal right.[52] The inmates here sought injunctive relief, which falls within the APLRA's definition of "prospective relief";[53] we have previously determined that DOC properly moved to terminate prospective relief under the *Cleary* Final Settlement Agreement in 2000.[54] Thus, unless the inmates allege violation of a state or federal right — not merely a common-law duty — breach of the Final Settlement Agreement alone does not entitle them to the injunctive relief they seek.[55] We therefore turn to their claims that the call rates violate their statutory and constitutional rights.

### 1. Right to reasonable access to a telephone under AS 33.30.231

Alaska Statute 33.30.231(a) provides: "A prisoner shall have reasonable access to a telephone except when access is suspended as punishment for conviction of a rule infraction or pending a hearing for a rule infraction involving telephone abuse." We have not yet had occasion to interpret this provision's guarantee of "reasonable

---

[52] Decision and Order, *Cleary v. Smith*, No. 3AN-81-05274 CI, at *4-*8 (Alaska Super., July 3, 2001); AS 09.19.200(a); *see also Hertz v. State, Dep't of Corr.*, 230 P.3d 663, 667 (Alaska 2010) (holding prisoner not entitled to relief because failed to demonstrate violation of state or federal right and sought prospective relief).

[53] AS 09.19.200(g)(5) (" '[P]rospective relief' means all relief other than compensatory monetary damages."); *see also Hertz*, 230 P.3d at 667-68 (noting that inmate's demand for declaratory and injunctive relief "f[e]ll squarely" within APLRA's definition of prospective relief).

[54] *Hertz*, 230 P.3d at 667.

[55] *See* AS 09.19.200(a).

access."[56] We apply our independent judgment to questions of statutory interpretation,[57] including "agency interpretations of statutory terms that do not implicate agency expertise."[58] "[U]nder Alaska's sliding-scale approach to statutory interpretation, 'the plainer the language of the statute, the more convincing contrary legislative history must be.' "[59]

The text of AS 33.30.231(a) requires only that prisoners have "reasonable" telephone access; it makes no mention of the cost of telephone calls.[60] The legislative history also does not mention costs, so it offers little guidance on this question. Alaska Statute 33.30.231 was passed in 1986.[61] It was part of a comprehensive overhaul of Title 33, Chapter 30: Prison Facilities and Prisoners.[62] One purpose of the overhaul appears to have been to codify the obligations DOC assumed through its 1983 settlement with one subclass of the *Cleary* plaintiffs.[63] A letter from the governor introducing the overhaul noted that the bill would authorize DOC to monitor prisoners' calls "so as to

---

[56] The only federal case to consider the provision, *Valdez v. Rosenbaum*, dealt with restrictions on an inmate's telephone privileges after he was placed in administrative segregation, not with call charges. 302 F.3d 1039, 1042-45 (9th Cir. 2002).

[57] *Hertz*, 230 P.3d at 666.

[58] *State, Dep't of Corr. v. Hendricks-Pearce*, 254 P.3d 1088, 1091 (Alaska 2011).

[59] *Bartley v. State, Dep't of Admin., Teachers' Ret. Bd*, 110 P.3d 1254, 1258 (quoting *Alaskans for Efficient Gov't Inc. v. Knowles*, 91 P.3d 273, 275 (Alaska 2004)).

[60] AS 33.30.231(a).

[61] Ch. 88, § 6, SLA 1986.

[62] *See* 1990 House Journal 2270.

[63] *See Smith v. Cleary*, 24 P.3d 1245, 1246 (Alaska 2001) (noting that DOC settled in 1983 with prisoners held by the state in federal facilities).

preserve the security and orderly administration of correctional institutions," but it said nothing about the cost of calls.[64] Amendments to AS 33.30.231 in 1990 and 1997 altered the call monitoring provisions,[65] and a 1992 amendment authorized DOC to contract for telephone services.[66] But none of these amendments dealt with or even mentioned telephone costs or modified subsection (a)'s requirement of "reasonable access to a telephone."[67] There is nothing in the legislative record to suggest that the legislature intended either to establish a limit on the cost of inmate telephone calls, to authorize DOC to charge a particular rate, or even to suggest a benchmark of what might be a "reasonable" rate. It therefore falls to us to construe the term "reasonable access" according to "reason, practicality, and common sense."[68]

In order to do so, we have reviewed other courts' consideration of related issues raised regarding their correctional facilities.[69] We also note that some states and

---

[64] 1985 House Journal 141.

[65] Ch. 56, §§ 1-3, SLA 1990; ch. 49, § 9, SLA 1997.

[66] Ch. 2, § 6, FSSLA 1992.

[67] *See* ch. 49, § 9, SLA 1997; ch. 2, § 6, FSSLA 1992 ; ch. 56, §§ 1-3, SLA 1990.

[68] *Marathon Oil Co v. State, Dep't of Nat. Res.*, 254 P.3d 1078, 1082 (Alaska 2011) (quoting *Native Village of Elim v. State*, 990 P.2d 1, 5 (Alaska 1999)).

[69] *See, e.g.*, *Harrison v. Fed. Bureau of Prisons*, 464 F. Supp. 2d 552, 555-57 (E.D. Va. 2006) (holding that three-cent-per-minute increase to long-distance telephone rate did not violate federal inmate's First Amendment rights, due process, or equal protection); *McGuire v. Ameritech Servs., Inc.*, 253 F. Supp. 2d 988, 1001-02 (S.D. Ohio 2003) (determining that recipients of inmate calls had raised First Amendment and equal protection challenges to call rates sufficient to survive motion to dismiss); *Benson v. State*, 887 A.2d 525, 528-31 (Md. 2005) (considering challenge to state's receipt of commissions on inmate collect call charges); *Walton v. N.Y. State Dep't of Corr. Servs.*,

(continued...)

localities have recently adopted or considered provisions that limit or eliminate telephone charges for inmates.[70] While other jurisdictions may offer some guidance, differences in Alaska's geography and statewide provision of correctional facilities may limit their usefulness. In 2007 a New York court considered rates comparable to those at issue here, holding that New York's Department of Correctional Services did not violate equal protection or the First Amendment when it took a 57.5% commission from the call revenues of the contractor providing telephone services in state prisons.[71] The court appeared to accept a determination by the New York Public Service Commission that the rate charged by the contractor — a $3 charge per call plus an additional charge of $0.16 per minute — was "just and reasonable," as was the portion of the fees the contractor retained — 42.5% or roughly $1.28 plus $0.07 per minute.[72] Similarly, in 2005 the Maryland Court of Appeals considered a challenge by recipients of inmate

---

[69]     (...continued)
921 N.E.2d 145, 155-57 (N.Y. 2009) (same).

[70]     *See* N.Y. CITY, ADMIN. CODE § 9-154 (2018) (requiring city to provide domestic telephone services to inmates in city correctional facilities at no cost and barring city from collecting revenue from such services); Dominic Fracassa, *SF to Allow Free Calls for Inmates, No Markups on Products Sold in Jail*, SAN FRANCISCO CHRONICLE (June 12, 2019), https://www.sfchronicle.com/bayarea/article/SF-to-allow-free-calls-for-inmates-no-markups-on-13974972.php (detailing initiative by San Francisco city officials to eliminate jail phone call fees and commissary merchandise markups); Jenna Carlesso, *Bill That Would Make Prison Phone Calls Free Advances*, CT. MIRROR (Apr. 9, 2019), https://ctmirror.org/2019/04/09/bill-that-would-make-prison-phone-calls-free-advances/ (discussing state legislative proposal to eliminate telephone charges in Connecticut prisons).

[71]     *Walton*, 921 N.E.2d at 155-57.

[72]     *Id.* at 148.

collect calls to the commissions the state received from call charges.[73]  At the time the telephone companies providing the services charged a flat rate of $0.85 for local calls, of which the State took 20%.[74]  The court held that the commission did not violate state law on any of the grounds raised, upheld dismissal of the plaintiffs' claims, and left the rates intact.[75]

DOC asserts that Securus's "local call charges are presently [$0.07] per minute, with a cap of $1" per call.  Larson and Ebli counter that Securus charges $1 "plus taxes and fees" per call.  Neither side presented any evidence to support their position, so there is none to demonstrate which claim, if either, accurately reflects the current rate structure or the amount that inmates, or their family and friends, are charged per call. We are therefore unable to evaluate the accuracy of these assertions.[76]

We recognize that both sides' asserted rates are similar to those approved by the New York and Maryland courts.[77]  But that does not mean that the rates are likewise "just and reasonable."  Even if DOC's purported rate of $0.07 per minute is accurate, our analysis of what is reasonable in Alaska must take into account our state's unique geography, economy, and statewide correctional system.  Larson and Ebli argue that many prisoners' families "are so poor that they cannot afford to pay a toll for a local

---

[73]     *Benson*, 887 A.2d at 528-31.

[74]     *Id.* at 528-29.

[75]     *Id.* at 539, 543, 546-47.

[76]     We again note, however, that when Securus petitioned for a rate increase, it sought to impose a "$1.00 flat rate charge for a local call" of any duration. Application, *see supra* n. 23.

[77]     *See Walton v. N.Y. State Dep't of Corr. Servs.*, 921 N.E.2d 145, 157 (N.Y. 2009); *Benson*, 887 A.2d at 528-29, 549.

telephone call." The sums paid for local calls with incarcerated family members by the individuals who provided affidavits were $480, $1,440, and $2,300 between October 2015 and March or April 2017. While these amounts were in fact paid, they appear to present substantial financial burdens for the families. But the record contains no evidence on this point except the affidavits.

And the superior court made no factual findings on whether call rates impose unreasonable burdens on inmates and their families. The court determined only that "[r]easonable access [under AS 33.30.231(a)] is not the same as the right to free phone calls." In reaching this conclusion the superior court appears to have construed Larson and Ebli's argument too narrowly. In claiming that current rates are unreasonable, they do not assert that the *only* reasonable alternative is free local calls.[78] In fact, the inmates point to the *Cleary* Final Settlement Agreement's maximum of $0.50 per call as support for their argument that $1 is not permissible. But the superior court did not consider whether a reasonable rate could be greater than zero but lower than the current $1 — with or without added taxes and fees. Without additional evidence and more detailed findings, we have no way to meaningfully review the superior court's decision about the inmates' statutory right to reasonable telephone access.

---

[78]    They suggest that free local calls should be available for indigent inmates who cannot afford the charges, but do not assert that AS 33.30.231(a) requires DOC to provide completely free calls to all inmates.

### 2. Entitlement to restitution for failure to provide reasonable access[79]

Larson and Ebli argue that the recipients of local telephone calls are entitled to restitution for DOC's violation of Title V, § (C)(2)(a) of the *Cleary* Final Settlement Agreement. In their reply to DOC's opposition to their motion to enforce in the superior court the inmates provided some detail to their argument. The reply devoted several pages to a discussion of applying the usual principles of contract interpretation to the *Cleary* Final Settlement Agreement,[80] quoted the Restatement sections that they cite before us, and concluded that the families are intended beneficiaries who are therefore entitled to restitution.

But in this appeal the inmates' argument is contained in a single paragraph:

> DOC breached [the *Cleary* Final Settlement Agreement] when they formed a third-party contract with Securus for providing telephone services and allowed Securus to obtain a toll for local telephone calls. The Restatement (Second) of Contracts [§]372 provide[s] that in instances of breach the injured party may elect restitution to recover money as an alternative to expectation of damages. Here, due to the constraints on the ability to obtain money damages for DOC's breach, it is appropriate to direct the payment of restitution to the Appellants' families.

---

[79] The inmates label their request as one for "restitution" rather than compensatory damages. Because they are representing themselves we accord them a liberal construction of their claims and pleadings. *Patterson v. Walker*, 429 P.3d 829, 831 (Alaska 2018) (quoting *Barber v. Schmidt*, 354 P.3d 158, 162 (Alaska 2015)).

[80] Final Settlement Agreement and Order, *Cleary v. Smith*, No. 3AN-81-05274 CI (Alaska Super., Sept. 21, 1990).

We regularly accord self-represented inmates liberal construction of their pleadings.[81] But even self-represented litigants must provide more than a cursory statement to be considered on appeal.[82] Because the inmates' entire argument that their families should receive compensatory damages[83] is made in a portion of a single paragraph in their brief, they have not met this minimal requirement. Their argument about restitution is therefore waived.[84]

### 3. Right to rehabilitation under the Alaska Constitution

Article I, section 12 of the Alaska Constitution provides that "[c]riminal administration shall be based upon," among other interests, "the principle of reformation."[85] We have held that this provision confers on prisoners a constitutionally protected right to rehabilitation that must be made "a reality and not simply something

---

[81] *Larson v. State, Dep't of Corrections*, 284 P.3d 1, 8 (Alaska 2012) ("The pleadings of pro se litigants are 'held to less stringent standards than those of lawyers.'") (quoting *Capolicchio v. Levy*, 194 P.3d 373, 378 (Alaska 2008)).

[82] *Petersen v. Mutual Life Ins. Co. of New York*, 803 P.2d 406, 410 (Alaska 1990) ("Where a point is not given more than a cursory statement in the argument portion of a brief, the point will not be considered on appeal.").

[83] *See Patterson*, 429 P.3d at 162.

[84] Even if it may be "appropriate to direct the payment of restitution" to the inmates' families, the families and not the inmates would have to seek that remedy. We express no opinion about their entitlement to such a remedy, but we note that in *Perotti v Corr. Corp. of Am.,* we observed that *Cleary*'s enforcement provision "contains no mention of the payment of compensatory or nominal monetary damages for violations." 290 P.3d 403, 409 (Alaska 2012) The inmates appear to acknowledge this uncertainty when they point out the "constraint on the ability to obtain money damages for DOC's breach."

[85] Alaska Const. art. I, 12.

to which lip service is being paid."[86]  This right is fundamental.[87]

In *Brandon v. State, Department of Corrections* we determined that visitation privileges are "a component of the constitutional right to rehabilitation."[88]  We recognized that visitation is "indispensable" and "critically important" to rehabilitation because it helps prisoners maintain ties to their families and the outside world, facilitates their re-entry into society after they have served their sentences, and reduces recidivism.[89]  Telephone contact with loved ones, particularly in a state as vast as Alaska, is a crucial component of visitation.  The right to rehabilitation must therefore encompass telephone access for inmates.  Its importance is magnified for inmates whose families may find travel to the correctional facility for in-person visitation prohibitively expensive.

But again the record does not contain enough evidence for us to determine whether current local call rates unconstitutionally burden inmates' right to rehabilitation. DOC asserts that even if some inmates and call recipients might find the cost of local calls to be high, it mitigates the problem by "allow[ing] a certain amount of free phone calls to indigent prisoners."  But neither the record nor DOC's current telephone access policy offers any indication of how inmates may qualify for or make free phone calls.[90]

---

[86]  *Abraham v. State*, 585 P.2d 526, 533 (Alaska 1978).

[87]  *Brandon v. State, Dep't of. Corr.*, 938 P.2d 1029, 1032 (Alaska 1997).

[88]  *Id.* at 1032 n.2.

[89]  *Id.* (first quoting 2 MICHAEL MUSHLIN, RIGHTS OF PRISONERS § 12.00 (2d ed. 1993); then quoting *Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 468 (1989) (Marshall, J., dissenting)).

[90]  *See* STATE OF ALASKA, DEP'T OF CORR., POLICIES & PROCEDURES 810.01 (2018), http://www.correct.state.ak.us/pnp/pdf/810.01.pdf.

As a result we cannot evaluate whether existing policies, even if they allow indigent inmates to make free local calls, adequately protect inmates' right to rehabilitation.

We therefore reverse the superior court's denial of Larson and Ebli's motion to enforce. We remand this case for the superior court to determine whether Securus's current rates for local telephone calls violate inmates' statutory and constitutional rights to reasonable telephone access and rehabilitation. In making its determination the court should take into account Alaska's unique geography and economy, as well as its statewide administration of correctional facilities.

**B.    The Superior Court Did Not Err By Holding That DOC Had Not Violated Any State Or Federal Rights By Rejecting The Computer Programming Book.**

Antenor argues that DOC has violated his rights by imposing a de facto blanket prohibition on inmates ordering any computer-related educational literature.[91] He argues first that this content-based restriction violates his state constitutional right to free speech.[92] He also argues that it violates his state constitutional right to reformation[93] and DOC's related statutory obligation to establish programs designed to "create or improve occupational skills," "enhance educational qualifications," and "otherwise

---

[91]    There is some evidence in the record to suggest that such an unwritten policy may exist, at least at Goose Creek: Antenor was twice denied access to computer programming books he ordered, once in 2014 and once in 2017. In both cases DOC phrased its rationale for the denials in general terms, stating in its 2014 findings that "[c]omputer programming [b]ooks constitute a threat to [the] safe and secure operation of the [f]acility," and stating in 2017 that "program[m]ing books [are] not allow[ed] for security reasons." DOC appears to acknowledge that it has a "restriction on computer programming books" generally.

[92]    *See* Alaska Const. art. I, § 5.

[93]    *See* Alaska Const. art. I, § 12.

provide for the rehabilitation and reformation of prisoners."[94]

DOC responds that the superior court correctly relied on United States Supreme Court precedent holding that prison officials are entitled to broad deference on matters related to prison security.[95] DOC contends its refusal to allow Antenor to have the book violated no state or federal right. It argues that its restriction on computer books was a reasonable exercise of the discretion recognized by the United States Supreme Court and asserts that, because the restriction prevents inmates from learning how to compromise the security of prison computer systems, its decision is entitled to broad deference. DOC argues further that Antenor's right to rehabilitation was not infringed because he was permitted to enroll in electronics and computer classes at Goose Creek even though he was denied the book he ordered.

### 1. Free speech provision of the Alaska Constitution

Article I, section 5 of the Alaska Constitution provides that "[e]very person may freely speak, write, and publish on all subjects, being responsible for the abuse of that right." The United States Supreme Court has recognized that those who publish reading material have a legitimate speech interest in being able to send the material to those who purchase it, including inmates.[96] Inmates also have a legitimate interest in being able to communicate with the outside world.[97] DOC's regulations provide that an

---

[94] AS 33.30.011(a)(3)(C), (D), (F).

[95] *See Bell v. Wolfish*, 441 U.S. 520, 547-48 (1979).

[96] *Thornburgh v. Abbott*, 490 U.S. 401, 408 (1989) ("Publishers who wish to communicate with those who, through subscription, willingly seek their point of view have a legitimate First Amendment interest in access to prisoners.").

[97] *See Procunier v. Martinez*, 416 U.S. 396, 417-19 (1974) (recognizing prisoners' free speech and liberty interests in sending letters to correspondents outside
(continued...)

inmate may purchase books or other reading material "subject to inspection for contraband" unless the material is obscene or could "reasonably be expected to (1) aid an escape; (2) incite or encourage any form of violence or other criminal activity; or (3) have an adverse impact on the rehabilitation of the prisoner possessing the material or other prisoners who have access to it."[98] DOC's policy implementing the regulation at the time Antenor ordered the Arduino book required Goose Creek's superintendent to "designate staff to review all incoming publications addressed to prisoners"; staff were directed to reject publications containing "material that could reasonably be expected to aid in escape [or] incite violence, theft, or destruction of property."[99]

Antenor argues that we should subject any policy that restricts inmates' access to "whole blocks of educational publications" to strict scrutiny and invalidate the policy unless it is "grounded in a compelling and factually supported basis." DOC instead suggests we should apply the test set forth by the United States Supreme Court in *Turner v. Safley*, under which a regulation that "impinges on inmates' constitutional

---

[97]    (...continued)
prison), *overruled in part on other grounds by Thornburgh v. Abbot*, 490, 413-14 U.S. (1989); *see also Lewis v. Casey*, 518 U.S. 343, 404-05 (1996) (Stevens, J., dissenting) (stating that "the residuum of liberty retained by prisoners" under federal constitutional free speech provision includes "freedom to communicate with the outside world," which may be "regulated and constrained" but not "obliterated" (citing *Thornburgh*, 490 U.S. at 411-12)).

[98]    22 AAC 05.510(b).

[99]    Former STATE OF ALASKA, DEP'T OF CORR., POLICIES & PROCEDURES 810.03 § VII(H)(2)-(3) (2013), https://www.law.umich.edu/special/policyclearinghouse/Documents/Alaska%20-%20810.03.pdf; *see* STATE OF ALASKA, DEP'T OF CORR., POLICIES & PROCEDURES 810.03 § VIII(C)(1) (2018), http://www.correct.state.ak.us/pnp/pdf/810.03.pdf.

rights . . . is valid if it is reasonably related to legitimate penological interests."[100] Two years after deciding *Turner* the Supreme Court applied the test to federal regulations authorizing prison officials to reject publications that were "detrimental to institutional security."[101] DOC argues that we should do the same because restricting computer programming books is a reasonable way to "prevent[] prisoners from learning how to hack into the prison computers," thus threatening prison security.

Antenor limits his free speech argument to the Alaska Constitution, however, and urges us to adopt a standard "that expands our protections beyond what the federal constitution requires." We have not yet had occasion to determine what level of scrutiny applies to state constitutional free speech claims by prisoners. While we are not bound by the Supreme Court's interpretation of federal free speech protections,[102] we have also declined to apply "an inflexible strict-scrutiny analysis" to other types of constitutional claims by prisoners, because doing so would "seriously hamper [prison officials'] ability to anticipate security problems and to adopt innovative solutions."[103] And in some contexts, such as prisoners' right to access the court system, we have

---

[100] 482 U.S. 78, 89 (1987).

[101] *Thornburgh*, 490 U.S. at 403-04.

[102] *See McGinnis v. Stevens*, 543 P.2d 1221, 1227 (Alaska 1975) ("[W]e are not bound by the Supreme Court's interpretation of federal constitutional provisions when interpreting parallel provisions of the Alaska Constitution."); *see also Larson v. Cooper*, 90 P.3d 125, 131-32 (Alaska 2004) (evaluating prisoner's free exercise claim not under *Turner* test but under two-part inquiry in which, once prisoner establishes that conduct at issue is religiously based and his or her belief is sincere, courts must weigh competing government interest and determine whether any compelling state interest "will suffer if an exemption is granted to accommodate the religious practice in issue" (quoting *Frank v. State*, 604 P.2d 1068, 1073 (Alaska 1979))).

[103] *Larson*, 90 P.3d at 132 (quoting *Mathis v. Sauser*, 942 P.2d 1117, 1121 n.7 (Alaska 1997)).

closely followed *Turner*, stating that a prison policy that "incidentally restrict[s] court access" may nevertheless be valid so long as it "is grounded in a legitimate penological objective" and bears "a reasonable relationship [to] the policy goal" it is meant to achieve.[104]

In this case we conclude that the *Turner* approach is appropriate for evaluating free speech claims by prisoners who challenge restrictions on incoming publications. *Turner* set forth four factors relevant to evaluating the reasonableness of a prison policy.[105] The first requires "a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it."[106] Second, courts must consider the existence of "alternative means of exercising the right that remain open to prison inmates."[107] Third, courts must assess "the impact accommodation of the asserted constitutional right will have on guards and other inmates."[108] And fourth, "the absence of ready alternatives is evidence of the reasonableness of a prison regulation," while the existence of such alternatives can

---

[104] *Mathis*, 942 P.2d at 1121. That case involved a DOC policy prohibiting prisoners from possessing computer equipment and printers in their cells; we held that a genuine issue of material fact existed as to whether the policy was *intended* to impede prisoners' access to the courts, rather than merely *incidentally* burdening it in service of a legitimate penological interest. *Id.* at 1123.

[105] *Larson*, 90 P.3d at 129 (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)).

[106] *Turner*, 482 U.S. at 89 (quoting *Block v. Rutherford*, 468 U.S. 576, 586 (1984)).

[107] *Id.* at 90.

[108] *Id.*

indicate that the regulation is "an 'exaggerated response' to prison concerns."[109]

DOC's asserted interest in maintaining the security of its computer systems is clearly legitimate; Antenor does not contest this, asserting instead that any relation between this interest and the restriction on programming books is "vague" and lacks a "factually supported basis." The challenged restriction need only have a rational connection to the asserted interest, and it does: restricting access to books from which inmates could potentially learn enough to compromise DOC's computer systems and electronic records protects the security of the computer system.[110]

The second *Turner* factor looks for alternative means for inmates to exercise the right at issue. The right to receive and read publications is implicated in this case.[111] Antenor's right to receive and read publications, however, is not denied per se. Rather, DOC's regulations provide that an inmate may purchase books or other reading materials, provided that the material is not obscene or could "reasonably be expected"

---

[109]   *Id.*

[110]   We take note, however, of Antenor's assertion at oral argument that the Arduino book was "relatively similar" to "two books [he] recently obtained from the institution library," both of which also allegedly taught programming in a similar computer language. The record contains no evidence of these other books, or indeed any evidence that books similar to the Arduino book are already available to inmates, so we cannot evaluate this claim. But we note that if DOC does in fact allow inmates access to similar programming books, this would tend to show that a policy prohibiting inmates from ordering such books bears no rational relation to any security interest. In that case DOC would have to make a more particularized showing that the content of a specific book posed a threat before it could deny inmates access to that book.

[111]   *See Keys v. Torres*, 737 F. App'x 717, 720 (5th Cir. 2018) (citing *Thornburgh v. Abbot*, 490 U.S. 401, 417-18 (1989) (The Fifth Circuit Court of Appeals has recognized a right to "send, receive, and read publications.").

to threaten the security of the facility.[112] Additionally, Antenor acknowledges that Goose Creek permits inmates to participate in electronics and computer education classes, allowing him to obtain information, training, and education in these subjects. The existence of these alternative avenues for inmates to exercise the right to receive and read publications weighs in favor of giving deference to DOC's decision to prohibit inmates from ordering programming books that could pose a risk to prison security.[113]

Third, the most obvious potential impact on DOC staff and other inmates of allowing inmates to have books about programming computers is that the inmates might learn the skills necessary to hack or introduce malware into DOC's computer systems. We note, however, that not every computer- or programming-related text necessarily deals specifically with computer security or would be likely to provide such information to prisoners. The record does not provide us with information about factors that might distinguish books that pose a risk from those that do not, and we decline to speculate. Accordingly, we give this factor limited weight.

Fourth, neither Antenor nor DOC has proposed alternatives to a general restriction on programming books. It may be that DOC could examine the content and topics covered in each individual programming book more closely to determine whether it threatens prison security, but the record offers us no basis on which to conclude whether such an approach would be feasible enough to constitute a "ready alternative," or whether it would place unrealistic demands on DOC in terms of expertise, time, and

---

[112] AS 33.30.11(a)(3)(C), (D), (F).

[113] *See Turner v. Safley*, 482 U.S. 78, 90 (1987) ("Where 'other avenues' remain available for the exercise of the asserted right, courts should be particularly conscious of the 'measure of judicial deference owed to corrections officials . . . in gauging the validity of the regulation.' " (alteration in original) (internal citations omitted) (first quoting *Jones v. N. C. Prisoners' Union*, 433 U.S. 119, 131 (1977); then quoting *Pell v. Procunier*, 417 U.S. 817, 827 (1974))).

logistics. Again, therefore, we accord this factor limited weight.

Based on our consideration of the *Turner* factors, we conclude that denying Antenor access to the Arduino book based on security reasons did not violate the Alaska Constitution's free speech provision.

### 2. Right to reformation provision of the Alaska Constitution

Antenor argues that DOC's restriction on programming-related books denies him self-study and education opportunities and thus violates his right to reformation and rehabilitation under article I, section 12 of the Alaska Constitution.[114] He suggests that because computers are a "major part of society" and programming knowledge is "a necessary component" of computer skills, inmates are entitled to educational materials on these topics. He also points to AS 33.30.011, which provides that the DOC commissioner must establish programs designed to "create or improve occupational skills," "enhance educational qualifications," and "otherwise provide for the rehabilitation and reformation of prisoners."[115] He argues that DOC regulations thus include a duty to provide inmates access to "[p]ost-secondary education opportunities consisting of courses of correspondence study."[116] When a facility lacks the resources to provide such programs directly, he asserts, DOC cannot prevent a prisoner from engaging in self-study by ordering relevant books.

But Antenor himself admits that he had access to some electronics and computer education at Goose Creek: he attempted to purchase the Arduino book after

---

[114] Alaska Const. art. I, § 12; *see Abraham v. State*, 585 P.2d 526, 533 (Alaska 1978) (holding that inmate had protected right to rehabilitation, including rehabilitative treatment, under article I, section 12 of Alaska Constitution).

[115] *See* supra n.112.

[116] The court made no factual findings regarding whether DOC or Goose Creek did in fact impose a blanket ban on computer-related books.

completing a DOC electronics class that included the study of microcontrollers. He further admits that it was through "collateral self-study books" on electronics that he "was introduced to the Arduino platform." He therefore clearly had access to at least some material that served the rehabilitation interests he identifies and provided the type of educational opportunities contemplated by AS 33.30.011(a)(3). Denying him access to one specific book did not violate his Alaska constitutional right to reformation.

The superior court appeared to conclude that even if Goose Creek had imposed a blanket ban on computer related books, it would be justified by security concerns.[117] Similarly, even if there is in fact a ban on obtaining computer-related books from *outside* the facility, Antenor was not denied access to related materials within Goose Creek. He acknowledges that he participated in at least one electronics and robotics class aimed at providing the type of rehabilitation contemplated in AS 33.30.011(a)(3). DOC has some discretion over the rehabilitative programs it makes available to prisoners; we have held, for instance, that transferring a prisoner from one prison employment position to another did not violate the prisoner's right to rehabilitation.[118] In that case we emphasized that the prisoner "was not denied all rehabilitative opportunities," merely transferred between positions.[119] Antenor likewise has not been denied all rehabilitative opportunities, or even all rehabilitative opportunities in his area of interest. Denying him access to a specific book, therefore, does not violate his constitutional right to reformation.

---

[117]     The court made no factual findings regarding whether DOC or Goose Creek did in fact impose a blanket ban on computer-related books.

[118]     *Hays v. State*, 830 P.2d 783, 785 (Alaska 1992).

[119]     *Id.*

## V.    CONCLUSION

Because the record does not provide enough evidence for us to meaningfully determine the reasonableness of the rates charged inmates for local telephone calls, we REVERSE the denial of Larson and Ebli's motion to enforce and REMAND for further proceedings consistent with this opinion.  Because we conclude that Goose Creek's restrictions on programming-related books are rationally related to a legitimate interest, and because they do not infringe on the right to rehabilitation, we AFFIRM the denial of Antenor's motion to enforce his claimed right to a particular text about computer programming.