*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| STATE OF ALASKA, DEPARTMENT OF CORRECTIONS, | ) ) ) | Supreme Court No. S-17892 |
| Petitioner, | ) ) | Superior Court No. 3AN-19-09950 CI |
| v. | ) ) | O P I N I O N |
| TREVOR STEFANO, | ) ) | No. 7616 – September 2, 2022 |
| Respondent. | ) ) ) | |

Petition for Review from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Peter R. Ramgren, Judge.

Appearances: Anna Jay, Assistant Attorney General, Anchorage, and Treg R. Taylor, Attorney General, Juneau, for Petitioner. Trevor J. Stefano, pro se, Anchorage, Respondent. Emily L. Jura, Assistant Public Defender, and Samantha Cherot, Public Defender, Anchorage, for Amicus Curiae Public Defender Agency.

Before: Winfree, Maassen, Carney, and Borghesan, Justices. [Bolger, Chief Justice, not participating.]

BORGHESAN, Justice.

## I. INTRODUCTION

The Department of Corrections (DOC) allows some inmates to serve a portion of their prison sentence outside a correctional facility while wearing electronic

monitoring equipment. Inmates serving a sentence on electronic monitoring live and work in the community, but are subject to restrictions on movement and conduct. If an inmate violates those restrictions, DOC may return the inmate to prison.

This case presents a jurisdictional question: does the superior court have jurisdiction to hear an appeal of DOC's decision to remove an inmate from electronic monitoring and return the inmate to prison? Within that jurisdictional question is a more fundamental question: is DOC's decision subject to the constitutional guarantee that "[n]o person shall be deprived of . . . liberty . . . without due process of law?"[1]

We hold that due process applies. Although we reject the argument that removal from electronic monitoring and remand to prison implicates the constitutional right to rehabilitation, as the inmate in this case argues, we conclude that serving a sentence on electronic monitoring affords a limited but constitutionally protected degree of liberty, akin to parole. Just as "a parolee may not be deprived of his limited liberty without due process of law,"[2] an inmate serving a sentence on electronic monitoring may not be returned to prison without safeguards to ensure that liberty is not wrongly taken away.

Nevertheless we hold that the superior court did not have appellate jurisdiction to review DOC's decision in this case. Appellate review of an agency's decision is possible only when the decision is the product of an adjudicative process in which evidence is produced, law is applied, and an adequate record is made. DOC's decisional process in this case was not an adjudicative process and did not create a record

---

[1]     Alaska Const. art. I, § 7.

[2]     *Bailey v. State, Dep't of Corr., Bd. of Parole*, 224 P.3d 111, 116 (Alaska 2010).

that permits appellate review.[3]  We therefore remand this case to the superior court to convert this case from an appeal to a civil action so that the parties can create the record necessary for judicial review of DOC's decision.

## II.     FACTS AND PROCEEDINGS

### A.     Facts

Trevor Stefano was found guilty of second-degree murder at the age of 22; he was sentenced to 40 years in prison with 15 years suspended.  In February 2018, after serving roughly twelve years of his sentence, he applied to serve the remainder of his sentence on electronic monitoring.  Under DOC Policies & Procedures 903.06, which then governed the electronic monitoring program, an incarcerated person was normally ineligible for electronic monitoring if the person had more than three years remaining to serve.[4]  But there was an exception to the three-year rule for someone who "exhibit[ed] exceptional rehabilitative progress."  DOC determined that Stefano had demonstrated exceptional rehabilitative progress and in May 2018 released him on electronic monitoring in Fairbanks.  Stefano's electronic monitoring agreement with DOC required

---

[3]     *See Welton v. State*, 315 P.3d 1196, 1199 (Alaska 2014) (holding superior court lacked appellate jurisdiction to review DOC's denial of prisoner grievance because grievance process "lacked several important hallmarks of an adjudication" and produced only "limited paper record . . . inadequate for appellate review").

[4]     In March 2021 DOC Policies and Procedures 903.06 was repealed and replaced by Policies and Procedures 818.10.  DOC, POLICIES AND PROCEDURES 903.06: NOTICE OF REPEAL (2021), https://doc.alaska.gov/pnp/pdf/903.06.pdf.  The relevant language of the policy in effect at the time of Stefano's removal is largely similar to that of the policy currently in effect. DOC, POLICIES AND PROCEDURES 903.06: COMMUNITY ELECTRONIC MONITORING (2017), https://web.archive.org/web/20191230020037/https://doc.alaska.gov/pnp/pdf/903.06.pdf; DOC, POLICIES AND PROCEDURES 818.10: SENTENCED ELECTRONIC MONITORING (2020), https://doc.alaska.gov/pnp/pdf/818.10.pdf.

him to obtain prior approval from DOC before friends, family members, and associates could visit his residence and before having contact with a convicted felon.

Stefano got married while in Fairbanks; he and his wife later moved to Anchorage. In early July 2019 Anchorage Police Department (APD) officers visited Stefano's apartment in response to a report of domestic violence. After investigating, the officers arrested Stefano. The officers also observed that Stefano's brother Connor was at Stefano's home. Connor had previously been convicted of a felony but was no longer in DOC custody. The APD officers reported Connor's presence to a probation officer.

Stefano's probation officer prepared an incident report. The report first cited Stefano for committing a "high-moderate infraction" as defined in 22 Alaska Administrative Code (AAC) 05.400(c)(19) (2018) by "refusing to obey a direct order of a staff member." It then stated that Stefano had "violated the Terms and Conditions of the Anchorage Electronic Monitoring (EM) program and has been terminated from the program." It explained that Stefano had violated term 9, prohibiting unauthorized contact with friends and family members, and term 21, prohibiting unauthorized contact with convicted felons. With respect to Stefano's termination from electronic monitoring, the report stated:

> Correspondence . . . indicated that [criminal charges against Stefano] had been dropped. I requested and reviewed the related court documents which indicated the Municipal Attorney had declined to prosecute. Collateral information indicated that the victim had requested the charge not be pursued against [inmate] Stefano. I determined that [inmate] Stefano had initiated contact with the victim from the jail shortly after he was booked; I requested and reviewed copies of some of the recordings. In short, the recordings revealed that [inmate] Stefano manipulated and directed the victim to request the charge be dropped. . . . The victim indicated that what she had told the police was true and she was fearful of him and worried that he would kill her or have her killed. . . .

Additional recordings are pending review however, considering the totality of the situation it is my professional opinion that the victim[']s concern[s] for her safety are adequately supported. My opinion is supported by the facts of the above incident, the victim[']s statements to police, the injury documented in the report, the recordings reviewed after [inmate] Stefano's booking and both offender[s'] history. Ultimately the behaviors demonstrated by [inmate] Stefano are inconsistent with the expectations, directives and Terms and Conditions of the [electronic monitoring] program.

### B. Administrative Proceedings

Stefano appealed his termination from electronic monitoring. His appeal was denied by a probation officer, who explained that: (1) Stefano had been given permission to have only telephonic contact, not in-person contact, with his brother Connor; and (2) although the domestic violence charges were dismissed, the officer had heard Stefano's "inappropriate statements to [his] wife" in the recorded calls from prison.

Stefano requested a classification hearing from DOC, asserting that he had a right to review of his removal from electronic monitoring because it is a rehabilitative program. DOC denied him a classification hearing, maintaining that "[electronic monitoring] is not a rehabilitati[ve] program."

Stefano received a disciplinary hearing on the (c)(19) infraction ("refusing to obey a direct order of a staff member"). Stefano requested that the recorded phone calls between him and his wife be entered into evidence, but the hearing officer denied his request, stating: "I don't think the phone recordings have anything to do with you violating a (c)(19) or not violating a (c)(19)." The hearing officer also refused to call Stefano's requested witnesses: Stefano's wife, his brother, and the arresting APD officer. The hearing officer said that his purpose at the hearing was "to figure out . . . if [Stefano] violated those two conditions" [of the electronic monitoring program] by

having his brother at his residence, and to determine whether Stefano "violated this infraction, (c)(19)." At the end of the hearing the hearing officer found Stefano guilty of the infraction and sentenced him to 30 days in punitive segregation.

Stefano appealed the disciplinary decision that same day. He listed eight points in his appeal statement, including that he "was removed from [the] DOC [electronic monitoring] rehabilitative program with no classification hearing and no consideration to [his] rehabilitation." The superintendent of the Anchorage Correctional Complex affirmed the disciplinary decision, addressing each of Stefano's points in turn. Regarding Stefano's termination from the electronic monitoring program without a classification hearing, the superintendent wrote only "[t]his is up to [the electronic monitoring program]."

Stefano subsequently reapplied to electronic monitoring. After his application was denied, he appealed and was again denied. The denial stated: "Based on the totality of your violations, to include the information included in the [(c)(19) incident report], I see no reason to allow you to reapply for [electronic monitoring] during the remainder of your incarceration."

C.    **Superior Court Proceedings**

Stefano appealed the disciplinary action to the superior court. In his points on appeal he claimed that DOC had improperly refused to provide him with the evidence against him, refused to allow him to call witnesses in his defense, and prevented him from having his attorney at the hearing. He also claimed that DOC had "failed to follow [its] own policy and procedure regarding the electronic monitoring program and improperly discharged Stefano from that program." Stefano later supplemented his points on appeal, adding a claim that his removal from electronic monitoring had violated his constitutional rights to due process and to rehabilitation.

After briefing and oral argument, the superior court issued a written decision in Stefano's favor. It first addressed DOC's argument that the superior court lacked jurisdiction over Stefano's termination from electronic monitoring. The superior court acknowledged that its appellate jurisdiction extends only to cases involving "an adjudicative record capable of review." The court concluded that Stefano's termination from electronic monitoring met this condition:

> Stefano was terminated from the [electronic monitoring] program and "written up" for his disciplinary infraction in a single document prepared by [his probation officer]. These incidents apparently stemmed from the same factual basis and involved similar considerations. Stefano immediately requested a classification hearing, and that request was denied. Instead, Stefano received a disciplinary hearing, the recording of which has been presented to this court as part of the record on appeal. The process Stefano received at that hearing is documented for this court, as are the forms Stefano submitted to DOC before and after that process. Stefano's claims relating to his termination from the [electronic monitoring] program relate to the sufficiency of the process he received from DOC before and after his termination from the program. From this detailed record, the court is able to review the process Stefano received and rule on these claims on the merits. Stefano is not required to re-litigate these issues in a separate proceeding.

The court then concluded that electronic monitoring is a rehabilitative program and that therefore Stefano was entitled to "some level of due process" upon being removed from electronic monitoring. Yet the court concluded that Stefano had not received adequate process because he had not been "permitted at his disciplinary hearing to challenge the basis for his termination from the [electronic monitoring] program." As to DOC's disciplinary ruling, the court held that DOC failed to provide a rationale as to why it cited Stefano for violating (c)(19) instead of another provision carrying less

severe consequences that was also applicable to his conduct. It therefore concluded the disciplinary decision was arbitrary and violated Stefano's substantive due process rights.

The court vacated both DOC's decision that Stefano was guilty of violating 22 AAC 05.400(c)(19) and its decision terminating Stefano from electronic monitoring, remanding for further proceedings. Acknowledging that it lacked authority to order DOC to reinstate Stefano on electronic monitoring, the court held that "Stefano is entitled to adequate process (i.e., a classification hearing) prior to his termination from the program."

DOC petitioned for review of the superior court's exercise of appellate jurisdiction over Stefano's termination from electronic monitoring. We granted the petition and ordered full briefing.

## III. DISCUSSION

This matter requires us to decide whether the superior court had appellate jurisdiction to review DOC's decision to remove Stefano from electronic monitoring. The appellate jurisdiction of the superior court is established in AS 22.10.020(d), which provides that "[t]he superior court has jurisdiction in all matters appealed to it from . . . [an] administrative agency when appeal is provided by law." There is no statute providing for appeal of a DOC decision to terminate a person from electronic monitoring. However, we have held that administrative appeal of a DOC decision is proper "even when not authorized by statute" if the challenged decision implicates a "fundamental constitutional right[]" and is made "in an adjudicative proceeding producing a record capable of review."[5] We therefore consider whether DOC's decision to terminate Stefano from the electronic monitoring program meets these criteria.

---

[5]      *Brandon v. State, Dep't of Corr.*, 938 P.2d 1029, 1031-32 (Alaska 1997) (citing *Owen v. Matsumoto*, 859 P.2d 1308, 1309 (Alaska 1993); *Hertz v. Carothers*, 784 P.2d 659, 660 (Alaska 1990); *Dep't of Corr. v. Kraus*, 759 P.2d 539, 540 (Alaska 1988)).

**A. Removing A Prisoner From Electronic Monitoring And Remanding The Prisoner To A Correctional Facility Implicates The Prisoner's Fundamental Constitutional Rights.**

We first decide whether DOC's decision to remove Stefano from electronic monitoring implicated a fundamental constitutional right.[6] Two rights are arguably at issue: the right to rehabilitation and the right to liberty. We assess each in turn.

**1. Removal from electronic monitoring does not implicate the constitutional right to rehabilitation.**

**a. Our prior decisions shed light on the contours of the constitutional right to rehabilitation.**

Stefano argues that his removal from electronic monitoring implicates his constitutional right to rehabilitation. To determine when and how that right comes into play, it is helpful to review our decisions applying it.

We first discussed the constitutional right of rehabilitation in *Abraham v. State*.[7] In that case, a prisoner argued that treatment for his alcoholism was essential to his reformation into a law-abiding person, but that this treatment "could not be supplied within the existing framework of prison programs."[8] We observed that the Alaska Constitution provides that criminal administration shall be based on "the principle of reformation" and "the need for protecting the public."[9] "Reformation," we explained, "relates to something being done to rehabilitate the offender into a noncriminal member

---

[6]     *Id.*

[7]     585 P.2d 526, 531-33 (Alaska 1978).

[8]     *Id.* at 531.

[9]     *Id.* at 530 (quoting Alaska Const. art. I, § 12 (amended 1994)). This constitutional provision was amended in 1994 to add three more principles to guide criminal administration: community condemnation of the offender, the rights of victims of crime, and restitution from the offender. Alaska Const. art. I, § 12.

of society."[10]  We concluded that the inmate had "a constitutional right to rehabilitative treatment particularly with respect to his consumption of alcohol."[11]  However, we did not attempt to define the contours of this right and instead remanded the matter to the superior court so that "the judiciary can take whatever steps are deemed necessary to make the constitutional right to reformation a reality."[12]

We next addressed the right to rehabilitation in *Ferguson v. State, Department of Corrections*.[13]  In that case an inmate's participation in the Alaska Correctional Industries Program, through which he had a job at a meatpacking plant in Palmer, was terminated after he tested positive for drugs.[14]  He sued DOC, claiming among other things that the State had deprived him of his liberty right to participate in the program without due process.[15]  Addressing this claim, we reasoned that "prisoners have an enforceable interest in continued participation in rehabilitation programs" under the Alaska Constitution.[16]  We then concluded that "[t]he prison industries program from which [the inmate] was excluded is a rehabilitation program," noting that participation

---

[10]     *Abraham*, 585 P.2d at 531.

[11]     *Id.* at 533.

[12]     *Id.*

[13]     816 P.2d 134, 139-40 (Alaska 1991).

[14]     *Id.* at 136.

[15]     *Id.* at 137.  The Alaska Constitution provides that "[n]o person shall be deprived of life, liberty, or property, without due process of law."  Alaska Const. art. I, § 7.

[16]     *Ferguson*, 816 P.2d at 139.

was "voluntary, requires application and approval, and confers special privileges."[17] "Since prisoners taking part in [the program] have a protected interest in the program, their participation cannot be terminated without a measure of due process of law."[18]

By contrast, we ruled in *Hays v. State* that DOC's decision to remove an inmate from his job as prison librarian and reassign him to work shoveling snow did not implicate the right to rehabilitation.[19] We reasoned that the inmate "d[id] not have an enforceable constitutional interest in continued employment as a prison librarian."[20] In a subsequent unpublished decision, we reasoned that "jobs within the prison entail no formal training program, specified objectives, or stated rehabilitative components"; "[t]hese institutional jobs are not part of any rehabilitative program."[21] Therefore, removing the inmate from his job in the prison laundry "d[id] not raise a fundamental constitutional question" and "[wa]s not reviewable on appeal."[22]

We reached the same conclusion about challenges to the denial of other benefits or privileges outside of formal rehabilitation programs. In *Mathis v. Sauser* we ruled that DOC's denial of a prisoner's request to have a computer printer in his cell did not implicate the right to rehabilitation.[23] We reasoned that the inmate "ha[d] not argued

---

[17]     *Id.* at 140.

[18]     *Id.*

[19]     830 P.2d 783, 785 (Alaska 1992).

[20]     *Id.*

[21]     *Moody v. State, Dep't of Corr.*, No. S-12303, 2007 WL 3197938, at *2 (Alaska Oct. 31, 2007).

[22]     *Id.*

[23]     942 P.2d 1117, 1124 (Alaska 1997).

that he [was] involved in any rehabilitative program requiring the use of a printer in his cell," nor did he "produce[] any evidence to support the proposition that the policy in question implicate[d] his rehabilitation."[24]  In later unpublished decisions we similarly concluded that access to a word processor[25] and permission to keep hobby and craft supplies in one's cell[26] do not implicate the right to rehabilitation.  And in *Antenor v. State, Department of Corrections* we ruled that DOC's decision to deny a prisoner access to a certain book on computer programming did not infringe his constitutional right to rehabilitation in light of the other educational materials and opportunities available to him in prison.[27]

     *Brandon v. State, Department of Corrections* presented the right to rehabilitation in a slightly different context.[28]  In that case a prisoner sought to challenge DOC's decision to transfer him to a facility outside Alaska.[29]  We concluded that the prisoner's challenge was "grounded on a fundamental constitutional right" to rehabilitation because of the potential to substantially impair his opportunity to have

---

[24]    *Id.*

[25]    *Adkins v. Crandell*, No. S-7794, 1999 WL 33958768, at *1 (Alaska Jan. 13, 1999).

[26]    *Moody*, 2007 WL 3197938, at *2.

[27]    462 P.3d 1, 19 (Alaska 2020) ("Antenor likewise has not been denied all rehabilitative opportunities . . . .  Denying him access to a specific book, therefore, does not violate his constitutional right to reformation.").

[28]    938 P.2d 1029, 1032 (Alaska 1997).

[29]    *Id.* at 1030.

visitation.[30] However, we cautioned that "[o]ur recognition that visitation privileges are a component of the constitutional right to rehabilitation does not define their required scope or the permissible limits on their exercise."[31] We established one of these limits in *Larson v. Cooper* when we affirmed DOC limitations on physical contact during visitation.[32] We recognized that "[s]ome physical contact may well promote rehabilitation" but rejected the suggestion that the Alaska Constitution "preclude[s] prisons from putting reasonable limits on contact visitation of maximum security prisoners."[33]

Finally, in *Hertz v. Macomber* we held that the constitutional right of rehabilitation did not give a prisoner the right to challenge particular conditions placed on his furlough.[34] We recognized that "furloughs are explicitly designed to further the goal of rehabilitation."[35] But we also recognized that "the right to rehabilitation does not create a right to furlough for all prisoners."[36] We observed that DOC policies tie prisoners' furlough eligibility to their classification categories — including community, minimum, medium, and close custody[37] — and that "once in DOC custody, the

---

[30]     *Id.* at 1032 & n.2.

[31]     *Id.* at 1032 n.2.

[32]     90 P.3d 125, 133-34 (Alaska 2004).

[33]     *Id.* at 133 (discussing article 1, section 12 of the Alaska Constitution).

[34]     297 P.3d 150, 157-58 (Alaska 2013).

[35]     *Id.* at 157.

[36]     *Id.*

[37]     DOC, POLICIES AND PROCEDURES 700.01:  PRISONER CLASSIFICATION (2014), https://doc.alaska.gov/pnp/pdf/700.01.pdf.

'decisions of prison authorities relating to classification of prisoners are completely administrative matters regarding which the inmate has no due process rights beyond the expectation of fair and impartial allocation of resources.' "[38] By this logic, DOC's classification decisions do not implicate prisoners' right to rehabilitation for purposes of judicial review just because classification has a downstream effect on rehabilitative opportunities.

Considering these decisions together, the following rules emerge. A prisoner has a protected interest in continued participation in formal rehabilitative programs,[39] and participation cannot be terminated without some measure of due process.[40] Outside of participation in formal rehabilitation programs, denial or withdrawal of a privilege or benefit does not implicate the right to rehabilitation unless the benefit has some clear connection to rehabilitation and its denial leaves the inmate without access to comparable rehabilitative opportunities.[41] And DOC decisions about

---

[38]   *Hertz*, 297 P.3d at 157 (quoting *McGinnis v. Stevens*, 543 P.2d 1221, 1237 (Alaska 1975)).

[39]   "Formal rehabilitative program" is defined *infra* at note 51 and accompanying text.

[40]   *Ferguson v. State, Dep't of Corr.*, 816 P.2d 134, 140 (Alaska 1991).

[41]   *See, e.g.*, *Hays v. State*, 830 P.2d 783, 785 (Alaska 1992) (holding that job reassignment from prison librarian to snow shoveler did not implicate right to rehabilitation); *Antenor v. State, Dep't of Corr.*, 462 P.3d 1, 19 (Alaska 2020) (holding that denial of access to specific book did not implicate right to rehabilitation in light of other educational materials and opportunities available to inmate); *Adkins v. Crandell*, No. S-7794, 1999 WL 33958768, at *1 (Alaska Jan. 13, 1999) (ruling that denial of access to word processor did not implicate right to rehabilitation when inmate "was allowed to participate in post-secondary education as part of his rehabilitation," was able to maintain passing grades without word processor, and "had access to a dictionary and/or thesaurus").

a prisoner's classification generally do not implicate the right to rehabilitation even if they may affect rehabilitative opportunities: classification categories are not formal rehabilitative programs, nor do they typically leave prisoners without access to rehabilitative opportunities. However, if a classification decision will substantially impair access to rehabilitative opportunities — such as by making visitation practically impossible — then it will implicate the right to rehabilitation and trigger judicial review.[42]

In light of these rules, we next consider whether electronic monitoring implicates the right to rehabilitation as either (1) a formal rehabilitative program or (2) a privilege or benefit with a clear connection to rehabilitation, the denial of which leaves the prisoner without access to comparable rehabilitative opportunities.

### b. Electronic monitoring is not a formal rehabilitative program.

The first question is whether electronic monitoring is formal rehabilitative programming. The Public Defender Agency, which has briefed this court as amicus curiae,[43] urges us to adopt as a test for determining whether a program is rehabilitative the three factors we considered in *Ferguson*. In that case we found that a prison industries program, which gave employment opportunities to prisoners, was rehabilitative because it was "voluntary, require[d] application and approval, and confer[red] special privileges."[44] But these three factors have not been consistently applied as a "test" since *Ferguson* was decided thirty years ago and encompass programs

---

[42] *See Brandon v. State, Dep't. of Corr.*, 938 P.2d 1029, 1032 & n.2 (Alaska 1997).

[43] We thank the Public Defender Agency for its helpful briefing on this matter.

[44] 816 P.2d at 140.

that do not fit even the dictionary definition of "rehabilitative."[45]  For instance, DOC Policies and Procedures 815.04 VII.D states that "Arts and Craft projects approved for work in the cell or living areas are limited to those approved by the Superintendents or designee,"[46] indicating that keeping arts and crafts materials in one's cell is "voluntary, requires application and approval, and confers special privileges."[47]  But in an unpublished case decided 16 years after *Ferguson*, we held that "[t]he loss of in-cell hobby and craft privileges . . . does not raise a fundamental constitutional question."[48]

Instead a rehabilitative program is one that is designed to address "specific problems that impelled the prisoner's antisocial conduct."[49]  The constitutional principle of reformation "relates to something being done to rehabilitate the offender into a

---

**45**      *See, e.g.*, *Rehabilitation*, BLACK'S LAW DICTIONARY (11th ed. 2019) (defining rehabilitation as "[t]he process of seeking to improve a criminal's character and outlook so that he or she can function in society without committing other crimes").

**46**      DOC, POLICIES AND PROCEDURES 815.04:  RECREATION AND PRISONER ACTIVITIES (2014), https://doc.alaska.gov/pnp/pdf/ 815.04-Arts.pdf.

**47**      *See Ferguson*, 816 P.2d at 140.

**48**      *Moody v. State, Dep't of Corr.*, No. S-12303, 2007 WL 3197938, at *2 (Alaska Oct. 31, 2007).

**49**      *Brandon v. State, Dep't of Corr.*, 938 P.2d 1029, 1034 (Alaska 1997) (Rabinowitz, J., dissenting in part).  In adopting Justice Rabinowitz's definition of a rehabilitative program from his partial dissent in *Brandon*, we do not undercut the court's decision in that case.  Justice Rabinowitz believed that the right to rehabilitation attached only to formal programming.  *Id.* at 1034-35.  The court disagreed, ruling that the right to rehabilitation may also be implicated by administrative decisions unrelated to rehabilitative programming if those decisions substantially impair an inmate's opportunity for rehabilitation.  *Id.* at 1031-32 (majority opinion).  Nothing in our decision today calls the court's decision in *Brandon* into question.  We merely endorse Justice Rabinowitz's definition of a formal rehabilitative program.

noncriminal member of society,"[50] so a rehabilitative program is one designed to address the factors that may lead to criminal behavior, such as addiction, lack of remunerative skills, lack of education, or deviant proclivities.[51] To determine whether a program is rehabilitative, we have considered both the statutory framework for these programs[52] and DOC's policies and procedures governing them.[53]

The existing statutory framework does not suggest that electronic monitoring is a rehabilitative program.[54] The statute governing electronic monitoring,

---

[50] *Abraham v. State*, 585 P.2d 526, 531 (Alaska 1978).

[51] *See Brandon*, 938 P.2d at 1034 (Rabinowitz, J., dissenting in part) ("[F]ormal [rehabilitative] program[s] address[] . . . the specific problems that impelled the prisoner's antisocial conduct [such as] alcohol abuse . . . [and] a lack of job skills.").

[52] *See, e.g.*, *Hertz v. Macomber*, 297 P.3d 150, 157 (Alaska 2013) (citing to language of statute governing furloughs to hold that "furloughs are explicitly designed to further the goal of rehabilitation").

[53] *See, e.g.*, *Moody*, 2007 WL 3197938, at *2 (noting that DOC Policies and Procedures 808.04 lists "employment in Alaska Correctional Industries programs," but not intra-prison jobs, as rehabilitative).

[54] One thing that does seem clear from the statutory text is the legislative intent that DOC's decision to take a prisoner off electronic monitoring not be subject to judicial review. The statute provides that a decision to place a prisoner on electronic monitoring "does not create a liberty interest in that status for the prisoner." AS 33.30.065(c). This proviso suggests the legislature did not wish electronic monitoring decisions to be subject to due process. However, if the electronic monitoring program is in fact rehabilitative — implicating the constitutional right to rehabilitation that cannot be deprived without due process — the legislature cannot simply override constitutional protections by declaring otherwise. *See Alaska Pub. Int. Rsch. Grp. v. State*, 167 P.3d 27, 43 (Alaska 2007) ("The judiciary alone among the branches of government is charged with interpreting the law." (citing *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803)); *Marbury*, 5 U.S. at 177 ("It is emphatically the province and duty of the judicial department to say what the law is.")). In fact, the legislative

(continued...)

AS 33.30.065, provides little detail about the content of the program or the procedures for administering it. Notably, the statutory text governing furloughs[55] — which like electronic monitoring permit inmates to serve a period of their sentence outside prison walls — reflects a clear intent to use furloughs for rehabilitation, permitting them for reasons such as "counseling and treatment for alcohol or drug abuse," employment, education, making "preparations for release," or "any other rehabilitative purpose."[56] There is no similar statement of rehabilitative purpose for the electronic monitoring program. The statute does require the commissioner to consider "the prospects for the prisoner's rehabilitation" in deciding whether an individual may participate in electronic monitoring.[57] Yet this proviso does not clearly suggest the program is intended to be rehabilitative. It may instead indicate an intent that only prisoners unlikely to re-offend — i.e., prisoners with good prospects for rehabilitation — should be released on

---

[54]    (...continued)
history indicates that the legislature itself knew that this statement was likely ineffective. The bill sponsor's staffer stated: "[W]hether the legislature says it or intends it, the court will decide whether there is a liberty interest or not." Minutes, H. Jud. Standing Comm. Hearing on H.B. 272, 20th Leg., 2d Sess. Tape 98-23, Side A, at 274 (Feb. 23, 1998) (testimony of Kevin Jardell, Legislative Administrative Assistant to Rep. Joe Green), http://www.akleg.gov/basis/Meeting/Text?Meeting=HJUD% 201998-02-23%2013:07:00. The staffer added that "[t]he whole statement is somewhat superfluous, when you really get down to the legal dynamics of it." *Id.* at 368. In any event, DOC does not argue that this proviso in AS 33.30.065(c) precludes us from ruling that removal from electronic monitoring implicates fundamental constitutional rights.

[55]    AS 33.30.901 defines furlough as "an authorized leave of absence from actual confinement for a designated purpose and period of time."

[56]    AS 33.30.101(a).

[57]    AS 33.30.065(b)(2).

electronic monitoring. In other words, this proviso serves the goal of protecting the public at least as much as it serves the goal of reformation.

The legislative history suggests that the legislature's primary purpose in creating the electronic monitoring program was "to provide the Department of Corrections an additional tool to help ease overcrowding and relieve some budget problems."[58] The bill file contains a few references to rehabilitation[59] and to related concepts like reducing recidivism,[60] "promot[ing] a crime-free lifestyle,"[61] and keeping families together.[62] Ultimately, neither the statutory text nor legislative history provided strong support for the notion that the electronic monitoring program, at least in its current form, is a program designed to address the specific problems that lead to criminal behavior.

We next turn to DOC's policies and procedures governing electronic monitoring, which shed light on whether DOC operates the program as a rehabilitative

---

[58] Minutes, H. Jud. Standing Comm. Hearing on H.B. 272, 20th Leg., 2d Sess. Tape 98-19, Side B, at 595 (Feb. 18, 1998) (testimony of Kevin Jardell, Legislative Administrative Assistant to Rep. Joe Green), http://www.akleg.gov/basis/Meeting/Text?Meeting=HJUD%201998-02-18%2013:05:00.

[59] *See* Harry N. Boone, Jr., *Electronic Home Confinement: Judicial and Legislative Perspectives*, PERSPS., Fall 1996, at 18, 20-23 (available in H. Fin. Comm. bill file); Written Testimony of Sharon L'Heureux, Fairbanks Native Ass'n (Apr. 7, 1998) (available in H. Fin. Comm. bill file).

[60] *See* Boone, *supra* note 59, at 23; ADMIN. OF JUST. SERVS., DEVELOPMENT OF AN AGENCY BASED SELF-EVALUATION INSTRUMENT FOR ELECTRONIC MONITORING PROGRAMS 9 (1996) (available in H. Fin. Comm. bill file).

[61] *See* NEB. PROB. SYS., INTENSIVE SUPERVISION PROBATION GOALS/OBJECTIVES, at 3 (available in H. Fin. Comm. bill file).

[62] *See* Boone, *supra* note 59, at 21.

program. At first blush, aspects of these policies and procedures suggest the program is rehabilitative. The first line of the DOC Policies & Procedures governing electronic monitoring states: "It is the policy of the Department of Corrections (DOC) to utilize electronic monitoring (EM) as a tool to effectively manage offenders for their successful re-entry and transition to the community."[63] "Successful re-entry and transition to the community" is clearly a rehabilitative purpose. Further, unless an exception is obtained, the electronic monitoring program requires participants to obtain education or employment, both of which we have previously indicated may foster rehabilitation.[64] By allowing participants to live with partners or family members and hold outside employment, electronic monitoring also facilitates contact with the community, which we recognized in *Brandon* was a significant component of rehabilitation.[65] At the same time, electronic monitoring participants are prohibited from interacting with certain

---

[63] DOC, POLICIES AND PROCEDURES 818.10: SENTENCED ELECTRONIC MONITORING (2020), https://doc.alaska.gov/pnp/p df/818.10.pdf; *see supra* note 4.

[64] *Ferguson v. State, Dep't of Corr.*, 816 P.2d 134, 140 (Alaska 1991) ("The prison industries program from which Ferguson was excluded is a rehabilitation program."); *Adkins v. Crandell*, No. S-7794, 1999 WL 33958768, at *1 (Alaska Jan. 13, 1999) ("It is clear from Adkins's complaint that he was allowed to participate in post-secondary education as part of his rehabilitation.").

[65] *Brandon v. State, Dep't of Corr.*, 938 P.2d 1029, 1032 n.2 (Alaska 1997) (quoting sources suggesting that visitation "is the most direct link for the inmate with the world left behind," "is indispensable to any realistic program of rehabilitation," and facilitates "the ultimate rehabilitation of the prisoner by strengthening his ties with the 'free world' "; that "[p]reservation of the family unit is important to the reintegration of the confined person"; and that "[s]trained ties with family and friends increase the difficulty of making the eventual transition back to the community").

people, presumably to protect them from bad influences and thus further their rehabilitation.[66]

Yet allowing a prisoner to serve a sentence on electronic monitoring does not address specific behaviors or problems that lead to criminal conduct any more than classification at a particular custody level. Although serving a sentence on electronic monitoring instead of inside a correctional facility allows a prisoner greater freedom, so does serving a sentence in a minimum rather than a maximum security facility. Apart from the freedom to live outside a correctional facility, the purpose, rules, and opportunities of electronic monitoring are similar in kind to the purpose, rules, and opportunities — available in varying degrees — at the different custody levels in prison (from the most restrictive "close custody" status to the least restrictive "community custody" status).[67] And, as discussed above, classification decisions to move a prisoner from one custody level to another generally do not implicate the right to rehabilitation.[68]

Take, for example, DOC's stated purpose for its electronic monitoring program: "[T]o effectively manage offenders for their successful re-entry and transition

---

[66] *See* DOC, FORM 818.10B: ELECTRONIC MONITORING TERMS AND CONDITIONS (2022), https://doc.alaska.gov/pnp/pdf/ 818.10b.pdf?new ("I will obtain prior approval from [electronic monitoring] officers before having visits from friends, family members, and/or associates to my residence with the exception of unannounced visits . . . . I agree to have no non-employment related, non-reentry related contact with a convicted felon without the permission of [electronic monitoring] officers.").

[67] *See* DOC, POLICIES AND PROCEDURES 700.01: PRISONER CLASSIFICATION (2014), https://doc.alaska.gov/pnp/pdf/700.01.pdf (describing the four custody levels and explaining that "[t]he custody status assigned to a prisoner is based on . . . the classification process").

[68] *Hertz v. Macomber*, 297 P.3d 150, 157 (Alaska 2013) (discussing *McGinnis v. Stevens*, 543 P.2d 1221, 1237 (Alaska 1975)).

to the community."[69]  Although this sounds rehabilitative, so does the stated policy of DOC's classification program:

> Prisoners shall be classified to the least restrictive custody level based on the assessment of behavioral risk factors, supervision needs, rehabilitative needs, and institutional behavior. . . . The classification process shall identify prisoners' rehabilitative and reentry requirements that promote public safety and provides for the responsible reformation and reintegration of offenders.[70]

In fact, almost every DOC program or policy ultimately serves the constitutional goals of protecting the public and reforming the offender.[71]  Yet we have held that not every DOC policy implicates the right to rehabilitation.[72]  The fact that a correctional program or policy has an ultimate purpose of ensuring that offenders may successfully reenter society does not mean that a program is a formal rehabilitative program in which the offender has a protected interest in continued participation.

Consider also electronic monitoring's work requirement.  The requirement that prisoners serving a sentence on electronic monitoring maintain employment or pursue education unless granted an exception is comparable to the rule that prisoners serving a sentence within a correctional facility must work when ordered to and may be

---

[69]     DOC, POLICIES AND PROCEDURES 818.10:  SENTENCED ELECTRONIC MONITORING; *see supra* note 4.

[70]     DOC, POLICIES AND PROCEDURES 700.01:  PRISONER CLASSIFICATION.

[71]     Alaska Const. art. I, § 12 ("Criminal administration shall be based upon . . . the need for protecting the public . . . and the principle of reformation.").

[72]     *See, e.g.*, *Hertz*, 297 P.3d at 157-58 ("[O]nce in DOC custody, the 'decisions of prison authorities relating to classification of prisoners are completely administrative matters regarding which the inmate has no due process rights . . . .' " (quoting *McGinnis*, 543 P.2d at 1237)).

punished for refusing to do so.[73] Under DOC policies, employment within a correction facility includes "academic and vocational education."[74] So the requirement to obtain employment or education is not unique to electronic monitoring, but applies generally to prisoners across the board. And although our decisions have distinguished between work outside a prison through the Correctional Industries Program and jobs inside a prison, the feature that distinguished the two for purposes of the right to rehabilitation was that "jobs within the prison entail no formal training program, specified objectives, or stated rehabilitative components" and "are not part of any rehabilitative program."[75] We have not been provided any evidence suggesting that the requirement to obtain education or employment while on electronic monitoring includes any formal training program or stated rehabilitative components. Thus we cannot conclude that there is a rehabilitative aspect of the electronic monitoring program's work requirement that is distinct from the work requirements applicable to all prisoners.

Finally, the electronic monitoring program resembles an extension, in many respects, of the in-custody classification system. DOC must consider a prisoner's prospects for rehabilitation for both in-custody classification and release on electronic

---

[73] AS 33.30.191(c) ("A prisoner who refuses to participate in productive employment inside a correctional facility when directed under this section is subject to disciplinary sanctions imposed in accordance with regulations adopted by the commissioner."); DOC, POLICIES AND PROCEDURES 812.10: PRISONER EMPLOYMENT (1995), https://doc.alaska.gov/pnp/pdf/812.10.pdf (same).

[74] DOC, POLICIES AND PROCEDURES 812.10: PRISONER EMPLOYMENT ("[P]roductive employment includes . . . academic and vocational education.").

[75] *Moody v. State, Dep't of Corr.*, No. S-12303, 2007 WL 3197938, at *2 (Alaska Oct. 31, 2007).

monitoring.[76]  Classification at a particular custody level and release on electronic monitoring both require prisoners to follow a host of rules and restrictions on movement that simultaneously protect others and promote orderly behavior.[77]  Although release on electronic monitoring facilitates contact with family that is important to rehabilitation, prisoners at all custody levels are allowed visitation with family and community members.[78]  And in both cases, visits are subject to approval from DOC.[79]  In short, the electronic monitoring program is comparable to a custody classification; the difference is largely in the degree of freedom.  Electronic monitoring, by allowing the prisoner to live outside of prison, is essentially the least restrictive form of custody, apart from being released on parole (which does not typically entail the use of electronic monitoring equipment).  Although electronic monitoring affords the prisoner the opportunity to

---

[76]  *Compare* AS 33.30.065(b)(2) (requiring DOC to consider, in deciding whether to allow prisoner to serve sentence on electronic monitoring, "the prospects for the prisoner's rehabilitation"), *with* DOC, POLICIES AND PROCEDURES 700.01: PRISONER CLASSIFICATION (requiring DOC to "identify prisoners' rehabilitative and reentry requirements that promote public safety and provides for the responsible reformation and reintegration of offenders" and to classify prisoner at least restrictive custody level based on assessment of "rehabilitative needs" among other factors).

[77]  For example, prisoners released on electronic monitoring must obtain prior approval from DOC before having visits from friends, family members, or associates at the prisoner's residence; "remain in [the] approved residence at all times, except for those hours approved by the [electronic monitoring] officers to fulfill employment, school/training, medical/treatment programs, and/or special authorized leave"; not consume or possess alcoholic beverages or controlled substances; and submit to a search of prisoner's person, property, residence, or vehicle upon request by DOC staff.  DOC, POLICIES AND PROCEDURES 818.10b: SENTENCED ELECTRONIC MONITORING.

[78]  DOC, POLICIES AND PROCEDURES 810.02: VISITATION (2013), https://doc. alaska.gov/pnp/pdf/810.02.pdf.

[79]  *See id.*; DOC, POLICIES AND PROCEDURES 818.10b: SENTENCED ELECTRONIC MONITORING.

engage in rehabilitative programming (just like prisoners confined in a correctional facility), we have not been presented with evidence that the electronic monitoring program directly targets specific problems that cause criminal behavior. Therefore the electronic monitoring program, in its current form, is not a formal rehabilitative program to which a liberty interest attaches.

### c. Removal from electronic monitoring does not substantially impair a prisoner's access to rehabilitative opportunities.

Removal from a formal rehabilitative program is not the only DOC action that implicates the constitutional right to rehabilitation. In *Brandon* we held that a prisoner had the right to appeal DOC's classification decision, which entailed transferring him to a facility in Arizona, because that move could substantially impair his ability to have visitation — and thus his rehabilitation.[80] Although our decision in *Brandon* did not address the issue of visitation in detail, it seems clear that what animated the decision was the likelihood that transfer to a prison in Arizona would make it practically impossible for the inmate to receive visits from family with any frequency, if ever.[81] In other words, transfer to an Arizona prison practically meant the loss of visitation. In *Larson*, by contrast, we held that reasonable limits on contact visitation did not implicate the right to rehabilitation.[82] Likewise, in *Antenor* we ruled that the denial of particular educational materials did not implicate the constitutional right to

---

[80]     *Brandon v. State, Dep't of Corr.*, 938 P.2d 1029, 1032 (Alaska 1997).

[81]     *See id.* at 1030 (noting prisoner's argument that "transfer [to Arizona] interferes with [prisoner's] rehabilitation because his family will not be able to visit him in Arizona"); *see also id.* at 1032 n.2 ("[V]isitation privileges are a component of the constitutional right to rehabilitation . . . .").

[82]     *Larson v. Cooper*, 90 P.3d 125, 133-34 (Alaska 2004).

rehabilitation because the prisoner had been afforded other educational materials and opportunities.[83] Yet that decision also implied that the denial of "all rehabilitative opportunities" — or even the denial of all rehabilitative opportunities respecting the relevant problem—would implicate the constitutional right to rehabilitation.[84] Together these decisions suggest that DOC actions implicate the constitutional right to rehabilitation, triggering judicial review, if they substantially impair or deny a prisoner's access to rehabilitative opportunities like vocational training, education, treatment for addiction, or visitation.

DOC argues that Stefano's removal from electronic monitoring did not infringe his right to rehabilitation because there are other rehabilitative opportunities available to prisoners in custody. For example, DOC points out that there are opportunities for employment and substance abuse treatment in prison. Some prisoners may even be eligible to pursue those opportunities in a community setting while remaining incarcerated.[85] And prisoners may maintain contact with family through visitation.[86] In light of these opportunities available to prisoners in custody, DOC argues, removal from electronic monitoring does not substantially impair a prisoner's access to rehabilitative opportunities.

---

[83] *Antenor v. State, Dep't of Corr.*, 462 P.3d 1, 19 (Alaska 2020).

[84] *Id.*

[85] DOC, POLICIES AND PROCEDURES 812.10: PRISONER EMPLOYMENT (permitting minimum custody prisoners to obtain work and education outside correctional facility).

[86] DOC, POLICIES AND PROCEDURES 810.02: VISITATION.

We agree with DOC. DOC makes various educational, vocational, and other rehabilitative programs available to in-custody prisoners.[87] Although prisoners who live with family when released on electronic monitoring clearly will have more opportunity for contact with those family members,[88] DOC's visitation rules for in-custody prisoners provide the opportunity for rehabilitative contact with family through visitation. Rehabilitative opportunities may well be more available to inmates outside the prison walls than within. But because prisoners have some access to education, vocational training, employment, treatment for addiction, and visitation while housed in a correctional facility (including some opportunity to obtain these rehabilitative programs outside the facility),[89] removal from electronic monitoring does not implicate the constitutional right to rehabilitation.

### 2. A prisoner released on electronic monitoring has a liberty interest protected by the Alaska Constitution that cannot be taken away without some measure of due process.

As noted above, the salient difference between serving a sentence on electronic monitoring and serving a sentence in a correctional facility is the degree of

---

[87] Our analysis rests on DOC's Policies and Procedures indicating that these opportunities are available to inmates within the prison walls. If rehabilitative opportunities are not actually available, that would present a different issue under the constitutional right to rehabilitation.

[88] It is worth noting, however, that a prisoner released on electronic monitoring must obtain prior approval before having visits from family members at the prisoner's residence.

[89] *E.g.*, DOC, POLICIES AND PROCEDURES 812.10: PRISONER EMPLOYMENT (allowing for "[w]ork [o]utside the [i]nstitution [p]erimeter"); *id.* ("[E]mployment includes . . . academic and vocational education . . . ."); DOC, POLICIES AND PROCEDURES 807.10: SPECIAL HEALTH CARE PROGRAMS (1986), https://doc. alaska.gov/pnp/pdf/807.10.pdf ("Detox and withdrawal . . . treatment outside the institution may be prescribed.").

freedom afforded to the prisoner. That difference raises the question of whether a prisoner has a true liberty interest protected by the due process guarantee — rather than a rehabilitation-based liberty interest[90] — in continuing to serve a sentence on electronic monitoring.

Parole, in which a prisoner has an undisputed liberty interest,[91] provides a helpful comparison in assessing a prisoner's liberty interest in serving a sentence on electronic monitoring. Like electronic monitoring, parole gives prisoners freedom they would not otherwise have in confinement. The U.S. Supreme Court recognized the value of a parolee's freedom in *Morrissey v. Brewer*.[92] The Court emphasized that "[t]he liberty of a parolee enables him to do a wide range of things open to persons who have never been convicted of any crime."[93] The parolee "can be gainfully employed and is

---

[90]    The due process clause provides that "[n]o person shall be deprived of . . . liberty . . . without due process of law." Alaska Const. art. I, § 7. As discussed above, the right to rehabilitation is a liberty interest protected by the due process clause. So too is the constitutional right to freedom from confinement. *See, e.g.*, *Morrissey v. Brewer*, 408 U.S. 471, 482-84, 489 (1972) (discussing parolee's protected liberty interest under federal due process clause in remaining out of confinement); *Brandon v. State, Dep't of Corr.*, 73 P.3d 1230, 1234 (Alaska 2003) (noting that due process guarantee of Alaska Constitution applies more broadly than that of its federal counterpart).

[91]    *Bailey v. State, Dep't of Corr., Bd. of Parole*, 224 P.3d 111, 116 (Alaska 2010) ("Even though parolees enjoy fewer rights than the general population, 'under both the United States and Alaska Constitutions, a parolee may not be deprived of his limited liberty without due process of law.' " (quoting *Paul v. State*, 560 P.2d 754, 756 (Alaska 1977))); *McCracken v. Corey*, 612 P.2d 990, 992 (Alaska 1980) ("It is clear that the parolee is entitled to certain due process rights at a parole revocation hearing, including the 'opportunity to be heard in person and to present witnesses and documentary evidence.' " (quoting *Morrissey*, 408 U.S. at 489)).

[92]    408 U.S. at 482.

[93]    *Id.*

free to be with family and friends and to form the other enduring attachments of normal life."[94] "Though the State properly subjects him to many restrictions not applicable to other citizens, his condition is very different from that of confinement in a prison."[95] And because a parolee "may have been on parole for a number of years and may be living a relatively normal life at the time he is faced with revocation,"[96] revocation "inflicts a 'grievous loss' on the parolee and often on others."[97]  In light of those consequences, and because "the liberty of a parolee . . . includes many of the core values of unqualified liberty," the Court concluded that "the [parolee's] liberty is valuable and must be seen as within the protection of the Fourteenth Amendment."[98]

Much of that analysis applies with equal force to a prisoner serving a sentence on electronic monitoring. Serving the remainder of one's sentence on electronic monitoring is, in a practical sense, very much akin to serving the remainder of one's sentence on parole.  A prisoner on electronic monitoring enjoys significantly greater freedom than in confinement. Although electronic monitoring places restrictions on prisoners, the restrictions are largely similar to those placed on parolees.[99] Revoking the

---

[94]     *Id.*

[95]     *Id.*

[96]     *Id.*

[97]     *Id.*

[98]     *Id.*

[99]     The "Electronic Monitoring Terms And Conditions" that Stefano signed required him to, for instance, "obey all state, federal, and local laws . . . and court orders"; "only reside in [the] approved residence"; refrain from having any "non-employment-related, non-reentry related contact with a convicted felon" or "offenders who are under any kind of DOC supervision without the permission of [electronic
(continued...)

freedoms that accompany electronic monitoring inflicts great loss, much like revoking the freedoms that accompany parole. The due process protections that safeguard the valuable liberty of a parolee should logically extend to the valuable liberty of a prisoner released on electronic monitoring.

There are two potential hurdles to recognizing that a prisoner has a liberty interest in continuing to serve a sentence on electronic monitoring: the legislature's statement that a decision by DOC to place a prisoner on electronic monitoring "does not create a liberty interest in that status for the prisoner";[100] and our own decision in *Diaz*

---

[99] (...continued)
monitoring] officers"; and "not possess any firearms, ammunition, explosives, or deadly weapons." Statutorily mandated conditions of parole require parolees to comply with all laws and court orders, to receive approval to change residences, to refrain from contacting felons without permission, and to refrain from possessing any firearms. AS 33.16.150.

We also note that the criteria for whether to release an inmate on electronic monitoring and discretionary parole involve comparable considerations. *Compare* AS 33.16.100(a) (authorizing Parole Board to consider, in deciding whether to grant discretionary parole, whether "(1) the prisoner will live and remain at liberty without violating any laws or conditions imposed by the board; (2) the prisoner's rehabilitation and reintegration into society will be furthered by release on parole; (3) the prisoner will not pose a threat of harm to the public if released on parole; and (4) release of the prisoner on parole would not diminish the seriousness of the crime"), *with* AS 33.30.065(b) (authorizing DOC to consider, in deciding whether to release prisoner on electronic monitoring, "safeguards to the public"; "the prospects for the prisoner's rehabilitation"; "the nature and circumstances of the offense for which the prisoner was sentenced or for which the prisoner is serving a period of temporary commitment"; "the needs of the prisoner"; "the record of convictions of the prisoner"; and "the use of drugs or alcohol by the prisoner").

[100] AS 33.30.065(c).

*v. State, Department of Corrections*, holding that release on electronic monitoring did not create a protected liberty interest under the federal constitution.[101]

Although statements of legislative intent are generally entitled to great weight, the particular intent expressed here does not dictate the scope of Alaska's Constitution. The legislature's statement indicates it did not wish electronic monitoring decisions to be subject to the constitutional guarantee of due process. Yet it is ultimately not for the legislature to delineate the protections of Alaska's Constitution. If the electronic monitoring program is structured in a way that affords a measure of liberty that our Constitution protects, the legislature cannot simply declare otherwise and override those constitutional protections with a statement of intent.[102] Indeed, DOC does not argue that this proviso means that electronic monitoring implicates no constitutional rights, and DOC's implicit concession on this point is well taken.

As for *Diaz*, our decision pertained to the federal constitution only; we did not directly address the Alaska Constitution. The prisoner in that case had sued individual correctional officers under 42 U.S.C. § 1983,[103] claiming among other things that their decision to remove her from electronic monitoring without a hearing violated her Fourteenth Amendment right to due process.[104] In applying the federal due process framework, we cited *Sandin v. Conner* for the proposition that "[t]he point at which

---

[101]     239 P.3d 723, 725 (Alaska 2010).

[102]     *See Alaska Pub. Int. Rsch. Grp. v. State*, 167 P.3d 27, 43 (Alaska 2007) ("The judiciary alone among the branches of government is charged with interpreting the law."), *see also supra* note 54.

[103]     Section 1983 provides individuals with a federal cause of action for money damages when a person acting "under color of" state law deprives them of any federal "rights, privileges, or immunities."

[104]     *Diaz*, 239 P.3d at 725-27.

restraints on a convicted prisoner's freedom implicate a federal-constitution-based liberty interest requiring due process of law is when her freedom is restrained in excess of her sentence in an unexpected manner."[105] We reasoned that under the federal constitution "due process requirements apply to parole revocations if a parolee returned to prison does not receive credit against her sentence for time spent subject to the conditions of parole."[106] We then contrasted parole with electronic monitoring, where time served is credited towards the sentence.[107] Because removal from electronic monitoring entails return to a correctional facility without prolonging the sentence, we concluded that removal did not meet *Sandin*'s standard of "restraint exceeding the sentence in an unexpected manner."[108]

We also recognized in *Diaz* that the Fourteenth Amendment protects some liberty interests created by state law.[109] The prisoner argued that removal from electronic monitoring "deprived her of her [state-created] liberty interest in rehabilitation."[110] Because *Diaz* involved a suit under Section 1983, which provides a cause of action for violations of federal law, we considered the due process protections of the federal

---

[105]    *Id.* at 730 (citing *Sandin v. Conner*, 515 U.S. 472, 484 (1995)). *Sandin* involved a prisoner who was placed in disciplinary segregation for 30 days. 515 U.S. at 475-77.

[106]    *Diaz*, 239 P.3d at 730 (citing *Morrissey v. Brewer*, 408 U.S. 471, 480-82 (1972)).

[107]    *Id.*

[108]    *Id.* at 730 n.33; *see Sandin*, 515 U.S. at 484.

[109]    *Diaz*, 239 P.3d at 730-31.

[110]    *Id.* at 731.

constitution only.[111] We again applied the standard articulated in *Sandin*, under which "the only state-created liberty interests protected by the Fourteenth Amendment are those in freedom from restraints which 'impos[e] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' "[112] Because removal from electronic monitoring would only return the prisoner to "ordinary prison life" rather than to atypical hardship, we held that the *Sandin* standard had not been met; the Fourteenth Amendment did not protect the prisoner's rehabilitation-based liberty interest.[113]

We therefore had no occasion in *Diaz* to consider whether electronic monitoring creates liberty interests protected by the Alaska Constitution.[114] And the Alaska Constitution affords prisoners more expansive protection than the Fourteenth Amendment, so *Sandin*'s framework is not a helpful guide to this question.[115] We therefore consider whether the electronic monitoring program confers on prisoners a liberty interest protected by the due process guarantee of the Alaska Constitution.[116]

---

[111]    *Id.* at 731 n.44.

[112]    *Id.* at 731 (alteration in original) (quoting *Sandin*, 515 U.S. at 484).

[113]    *Id.* at 731-32.

[114]    *Id.* at 731 n.44.

[115]    *See Brandon v. State, Dep't of Corr.*, 73 P.3d 1230, 1234 (Alaska 2003) ("[W]e have interpreted the due process guarantee under the Alaska Constitution more broadly than the United States Supreme Court has interpreted the identical provision of the United States Constitution."); *id.* (describing "parameters of state constitutional due process rights to be afforded to prisoners in disciplinary proceedings" under Alaska Constitution and explaining that the United States Supreme Court set "much narrower" parameters under the federal Constitution in *Sandin*).

[116]    In applying the *Sandin* standard, the *Diaz* decision focused on the fact that time spent on electronic monitoring is credited to the prisoner's sentence, so that removal

(continued...)

As noted above, much of the Supreme Court's explanation for why there is a protected liberty interest in parole applies with equal force to electronic monitoring. Although a prisoner on electronic monitoring is subject to restrictions, the prisoner lives in conditions "very different from that of confinement in a prison" and is able to live "with family and friends and to form the other enduring attachments of normal life."[117] The First Circuit Court of Appeals observed, in ruling that prisoners serving a sentence on electronic monitoring have a protected liberty interest in that status, that electronic monitoring "allow[s] the appellees to live with their loved ones, form relationships with neighbors, lay down roots in their community, and reside in a dwelling of their own choosing (albeit subject to certain limitations) rather than in a cell designated by the government."[118] And although prisoners on electronic monitoring are subject to many

---

[116]     (...continued)
from electronic monitoring does not prolong the sentence (unlike revocation of parole). 239 P.3d at 730. Yet *Diaz* acknowledged that the U.S. Supreme Court subsequently held federal due process attached to Oklahoma's pre-parole program — even though time spent on pre-parole was credited to the sentence. *Id.* at 730 n.34 (citing *Young v. Harper*, 520 U.S. 143, 144-45 (1997)). Following *Young*, courts have held that removal from electronic monitoring implicates federal due process even when time is credited, albeit without directly addressing the point. *González-Fuentes v. Molina*, 607 F.3d 864, 890 (1st Cir. 2010), *following first appeal Rivera-Feliciano v. Acevedo-Vilá*, 438 F.3d 50, 57 (1st Cir. 2006) (discussing that state would "give credit for . . . time served in the [electronic surveillance program]"); *Cox v. State*, 706 N.E.2d 547, 548-50 (Ind. 1999); *see In re McNeal*, 994 P.2d 890, 893-98 (Wash. App. 2000).

In any event whether time spent on parole or electronic monitoring is credited is not dispositive under Alaska's due process clause, which affords more protection than the federal due process clause under *Sandin*. *Brandon*, 73 P.3d at 1234.

[117]     *Morrissey v. Brewer*, 408 U.S. 471, 482 (1972).

[118]     *González-Fuentes*, 607 F.3d at 887 (observing that prisoner litigants were "living with either close relatives, significant others, or spouses, and in many cases with
(continued...)

-34-                                                                7616

restrictions, "[i]mplicit in the system's concern with . . . violations is the notion that the [prisoner] is entitled to retain his liberty as long as he substantially abides by the conditions" set forth by DOC.[119]

Taking this liberty away from the prisoner and remanding him to a correctional facility "inflicts a 'grievous loss' on the [prisoner] and often on others."[120] According to Stefano, his removal from electronic monitoring resulted in separation from his wife and family; the loss of his job and the good faith of his employer; a large arrearage on his monthly rent; default on phone, insurance, and credit card bills he was suddenly unable to pay; and inability to care for his special-needs dog. These kinds of losses and setbacks will be common when a prisoner serving a sentence on electronic monitoring is returned to custody. Releasing a prisoner on electronic monitoring invites — and in fact requires — the prisoner to re-establish bonds with free society.[121] Severing those bonds by returning the prisoner to custody results in a loss of freedom only somewhat less severe than placing the prisoner in custody in the first place. That freedom, like the freedom of a parolee, is a liberty interest protected by the Alaska Constitution's due process guarantee — even though the same interest may not be protected by the federal constitution under the *Sandin* standard.

Courts in other jurisdictions have similarly distinguished the *Sandin* standard and applied a different framework to electronic monitoring and comparable

---

[118]    (...continued)
children").

[119]    *See Morrissey*, 408 U.S. at 479.

[120]    *See id.* at 482.

[121]    *See* DOC, POLICIES AND PROCEDURES 818.10: SENTENCED ELECTRONIC MONITORING (2020), https://doc.alaska.gov/pnp/p df/818.10.pdf.

programs. The First Circuit, for example, recognized the value in comparing conditional release "with the liberty interest in parole as characterized by *Morrissey*."[122] The court then conceived of "a spectrum of liberty that extends from the 'ordinary incidents of prison life' at its lowest end to parole at its highest" and concluded that different legal standards apply at each end of the spectrum:

> When the challenged action concerns what can be fairly described as the transfer of an individual from one imprisonment to another, *Sandin*'s "atypical hardship" standard remains our lodestar; when, on the other hand, it concerns the disqualification of an individual from a supervised release program that begins to more closely resemble parole, *Young* and *Morrissey* will form part of the guiding constellation. The upshot is that in cases in which an individual is not incarcerated in prison, the extent of his existing liberty within the relevant program — and not just the extent of his reduced liberty in a challenged placement — must be taken into account.[123]

That court viewed release on electronic monitoring as "sufficiently similar to traditional parole . . . to merit protection" under the federal due process clause.[124] Other courts have likewise concluded that release on electronic monitoring or community custody programs confers on a prisoner a liberty interest that is protected by due process, even under the federal constitution.[125]

---

[122] *González-Fuentes*, 607 F.3d at 887 (quoting *Holcomb v. Lykens*, 337 F.3d 217, 221 (2d Cir. 2003)).

[123] *Id.* at 889.

[124] *Id.* at 890.

[125] *See McBride v. Cahoone*, 820 F. Supp. 2d 623, 631 (E.D. Pa. 2011) (holding prisoner has constitutionally protected liberty interest in serving sentence on electronically monitored home confinement instead of prison: "[C]ourts . . . readily
(continued...)

In *Young v. Harper* the U.S. Supreme Court applied *Morrissey*'s holding to Oklahoma's "pre-parole" program, explaining that the "minor difference" between the state's system of parole and its system of pre-parole did not "alter the fundamentally parole-like nature of the" latter system.[126] The same logic applies here. Because of the substantial similarity between release on parole and release on electronic monitoring described above, we conclude that a prisoner released on electronic monitoring has a liberty interest protected by the due process guarantee of the Alaska Constitution.[127]

**B.    DOC's Decision In This Case Was Not The Product Of An Adjudicative Proceeding Producing A Record Adequate For Appellate Review.**

Showing that the challenged DOC decision implicates a fundamental constitutional right is not enough to establish appellate jurisdiction. Stefano must also

---

[125]    (...continued)

acknowledge the existence of a constitutionally-significant difference between living at home, even with restrictions, and serving a sentence in institutional confinement." (emphasis omitted)); *Sallier v. Makowski*, No. 00-10254-BC, 2002 WL 31772020, at *8 (E.D. Mich. Nov. 6, 2002) (concluding that placement of inmate on home confinement under electronic monitoring "is the functional equivalent of parole" so that removal from program triggers due process under *Morrissey v. Brewer*); *In re McNeal*, 994 P.2d 890, 894-98 (Wash. App. 2000) (distinguishing between inmate disciplinary hearings and community custody revocations in holding that due process protections apply to revocations of community custody because it is similar to parole); *Cox v. State*, 706 N.E.2d 547, 549-50 & n.5 (Ind. 1999) (holding that due process protections applicable to probation revocation apply upon revocation of defendant's placement in community corrections program entailing "residential and work release, electronic monitoring, day treatment, or day reporting").

[126]    520 U.S. 143, 152 (1997).

[127]    That is not to say that the processes outlined in statute for a parole revocation hearing necessarily apply to removal from electronic monitoring, and we express no opinion on what process must be provided.

show that the DOC decision was the result of an adjudicative proceeding that produced a record adequate for judicial review.[128] We conclude that the challenged decision does not satisfy this requirement.

We first address a threshold issue: which proceeding and records are we to consider? The superior court concluded that Stefano's disciplinary proceeding, culminating in the hearing on July 30, could be the basis for appellate review of the electronic monitoring decision. Amicus curiae Public Defender Agency concurs in that approach, arguing that the transcript of the disciplinary hearing and associated documents "constituted a sufficient adjudicative record for review on appeal with regard to Stefano's [electronic monitoring] claim." DOC counters that the decision to terminate Stefano from electronic monitoring and the decision to discipline him for refusing to follow an order from staff are two separate decisions resting on different grounds and resulting from distinct processes. DOC has the better argument.

First, the decision to terminate Stefano from electronic monitoring was made before the disciplinary hearing even took place. Stefano was terminated from electronic monitoring in the incident report dated July 17, appealed his electronic monitoring termination on July 19, and requested a classification hearing regarding his termination on July 22 — all before he even received notice of the disciplinary hearing on July 23. Stefano's electronic monitoring appeal was then denied on July 24, six days before the disciplinary hearing on July 30. The administrative proceeding that culminated in the hearing on July 30 could not have been the process that yielded the final decision on his removal from electronic monitoring six days earlier.

Second, the two decisions were justified on different grounds. The disciplinary decision was based solely on Stefano's contact with his brother Connor; the

---

[128] *Welton v. State, Dep't of Corr.*, 315 P.3d 1196, 1198 (Alaska 2014).

decision to remove Stefano from electronic monitoring was based on a wider range of factors. The incident report explaining Stefano's removal from electronic monitoring referred explicitly to "the totality of the situation" stemming from the domestic violence arrest and referred to Stefano's wife's statements to police and the subsequent phone calls between Stefano and his wife. The superior court found that the language in the incident report "indicates conclusively that Stefano's contact with Connor was not the sole basis for his dismissal from the [electronic monitoring] program." By contrast, the hearing officer on July 30 repeatedly emphasized that the sole purpose of the disciplinary hearing was "to figure out . . . if [Stefano] violated these two conditions [of the program] by having [his] brother at [his] residence." The hearing officer denied the admission of evidence that did not bear on this single question and refused to accept argument about the effect of the termination from electronic monitoring on Stefano's rehabilitation.

Because the two decisions rested on different grounds, the proceedings pertaining to the disciplinary proceeding cannot be the basis for appellate review of the electronic monitoring decision. For example, even if a reviewing court found no evidence that Stefano's brother was at his house — the basis for the disciplinary decision — this conclusion would not negate the basis for the electronic monitoring decision, which rested on his arrest and the recordings in which Stefano allegedly pressured his wife to recant her accusations of domestic violence.

The record of the electronic monitoring decision, considered alone, does not reflect an adjudicative proceeding and is not susceptible to meaningful appellate review. The "essential elements of adjudication" include:

> adequate notice to persons to be bound by the adjudication, the parties' rights to present and rebut evidence and argument, a formulation of issues of law and fact in terms of specific parties and specific transactions, a rule of finality specifying the point in the proceeding when presentations end

and a final decision is rendered, and any other procedural elements necessary for a conclusive determination of the matter in question.[129]

We have also emphasized the importance of a "verbatim record of the proceedings" — in particular a recorded hearing — to "facilitate[] an administrative appeal."[130]

Stefano was terminated from electronic monitoring with few, if any, of these elements. A probation officer terminated Stefano's participation in electronic monitoring upon concluding that Stefano's behaviors were "inconsistent with the expectations, directives and Terms and Conditions of the [electronic monitoring] program." The appeal process did not allow Stefano the opportunity to present and rebut evidence and argument, nor is there any indication that a burden of proof was employed. Rather, the probation officer determined that Stefano should be terminated from electronic monitoring based on the officer's own evaluation of the totality of the circumstances.

This process closely resembles the prisoner grievance process we deemed insufficient for appellate review in *Welton v. State, Department of Corrections*.[131] As in that case, the process for removing Stefano from electronic monitoring lacked "several important hallmarks of an adjudication" and produced "only a paper record" that does not facilitate meaningful appellate review of DOC's determination that Stefano's conduct was inconsistent with the expectations of the electronic monitoring program.[132]

---

[129]  *Brandon v. State, Dep't of Corr.*, 938 P.2d 1029, 1032-33 (Alaska 1997).

[130]  *Welton*, 315 P.3d at 1199 (citing *McGinnis v. Stevens*, 543 P.2d 1221, 1236 (Alaska 1975); *Dep't of Corr. v. Kraus*, 759 P.2d 539, 540 (Alaska 1988)).

[131]  *Id.*

[132]  *See id.* at 1198-99 ("[T]he limited paper record produced by the DOC's
(continued...)

Because Stefano was not terminated from electronic monitoring in an adjudicative proceeding producing a record sufficient for appellate review, his challenge to DOC's decision does not fall within our precedent permitting appellate jurisdiction in the absence of statutory authority.

## C.     We Decline To Expand The Superior Court's Appellate Jurisdiction.

Amicus curiae Public Defender Agency argues that we should expand the superior court's appellate jurisdiction to allow it to hear all claims that a DOC decision was rendered without minimal due process protections, regardless of whether an adjudicative record exists. The Agency suggests that the issues in such appeals — whether DOC's decision implicates a fundamental constitutional right and whether it has afforded sufficient process to the prisoner — do not require an administrative record and are competently decided as matters of law. It contends that allowing appeals of this sort would eliminate procedural hurdles that come with filing a civil action in superior court, making litigation easier, quicker, and less expensive.

We decline to broaden the existing jurisdictional exception. We are less confident than the Public Defender Agency that this proposed rule will be easily administrable. If we were to adopt the Agency's rule, the superior court proceeding would turn on the nature of the prisoner's legal theory: the court's ability to hear the case would depend on whether the prisoner's claim sounded in due process. But the nature of a prisoner's challenge to a DOC decision — which will often be filed without the assistance of counsel — may not be readily apparent to the superior court at the outset. This approach would make uncertainty and procedural wrangling even more likely than under the current legal framework, where the action turns on the nature of

---

[132]     (...continued)
informal grievance process is inadequate for appellate review, and the grievance process itself lacks several important hallmarks of an adjudication.").

DOC's decision (which should be apparent from the initial paperwork). And a challenge to a DOC decision on both procedural grounds (the decision was the result of unfair process) and substantive grounds (the decision was wrong on the merits) would be subject to bifurcation, with the procedural challenge proceeding as an administrative appeal and the substantive challenge proceeding as a civil action.[133] The additional complexity of expanding the jurisdictional exception is not warranted, as a prisoner may challenge an alleged violation of constitutional rights with an original action in superior court.[134]

Because our precedents do not permit Stefano's challenge to his removal from electronic monitoring to be heard as an administrative appeal, he must pursue this challenge as a civil action in superior court.

IV.    CONCLUSION

That portion of the superior court's decision pertaining to removal from electronic monitoring is VACATED. We REMAND to the superior court to allow Stefano to convert his appeal to an original action.

---

[133]    The Public Defender Agency counters that this bifurcation is no worse than the bifurcation that would result from holding that Stefano's electronic monitoring claim cannot be heard as an administrative appeal even though his disciplinary claim may. We disagree. Stefano is challenging two distinct decisions; requiring these challenges to proceed along different paths is not unnatural or cumbersome. Challenging the same decision in two different proceedings is a far more convoluted process.

[134]    *See Owen v. Matsumoto*, 859 P.2d 1308, 1310 (Alaska 1993) ("Any alleged violation of fundamental constitutional rights must be afforded judicial review. However, Owen has not shown that review by administrative appeal is the proper avenue for judicial review of an alleged miscalculation of his sentence.").